535 So.2d 773 (1988)
James M. MOORE, Plaintiff-Appellant,
v.
CENTRAL AMERICAN LIFE INSURANCE COMPANY, Defendant-Appellee.
No. 19715-CA.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1988.
*774 Hamilton & Carroll by O.N. Hamilton, Jr., Oak Grove, for plaintiff-appellant.
Blackwell, Chambliss, Hobbs & Henry by Sam O. Henry, III, West Monroe, for defendant-appellee.
Before HALL, SEXTON and LINDSAY, JJ.
LINDSAY, Judge.
The plaintiff, James M. Moore, appeals from a trial court judgment which denied his claim for death benefits under an accident policy issued to his late wife by the defendant, Central American Life Insurance Company. The trial court found that recovery was barred by an exclusionary provision in the policy which precluded the payment of benefits if the decedent was under the influence of intoxicating beverages at the time of injury. For the following reasons, we reverse the judgment of the trial court.

FACTS
Lilly Moore, the plaintiff's wife, took out an accident policy on herself which provided for death benefits of $5,000. The policy was issued by the defendant on May 1, 1983, and designated Mrs. Moore's husband as beneficiary.
The record reveals that on April 18, 1985, while shopping in the Big Star Supermarket in Bastrop, Mrs. Moore fell and hit her head on a shelf. She was admitted to Morehouse General Hospital in a semi-comatose state with a scalp laceration and hematoma. She was transferred to St. Francis Medical Center in Monroe on April 19, 1985, where she died the following day.
Mr. Moore testified that his wife had been ill with diarrhea for several days before her fall. This was corroborated by a prescription for Paregoric Kaopectate written for Mrs. Moore and filled on April 11, 1985. Mr. Moore further testified that his wife was of German extraction and was accustomed to drinking beer. Mr. Moore testified that he was unaware of any alcoholic consumption by his wife on the day of her fall. He also stated that he had not consumed any alcohol for a week prior to his wife's fall.
The manager of the Big Star Supermarket, Jerry D. Moore, testified that Mrs. Moore was a frequent customer. He stated that on the day of the accident he saw her in the store prior to her fall. He stated that "[t]hat day I didn't know is [sic] she was just real sick or what it was but she was staggering real bad." He also indicated that he was aware that she "walked peculiar almost all the time." (Mrs. Moore, in fact, walked with a limp.) He admitted that Mrs. Moore exhibited no other possible signs of intoxication that day.
While Jerry Moore did not actually see Mrs. Moore fall, he said that he heard the sound of her head striking the shelf. He and another man rushed to her aid. Mrs. *775 Moore was unconscious and bleeding from a head wound. Jerry Moore noticed blood on the bottom shelf where she had struck her head. He immediately summoned an ambulance.
Another supermarket customer who observed Mrs. Moore prior to her fall was Bobby Wayne Lucas. He testified that he knew the Moores because the plaintiff is a stepbrother of his father's cousin. He stated that he was aware that Mrs. Moore walked with a limp. He and his wife observed Mrs. Moore in the parking lot prior to entering the store. He testified that he had not seen Mrs. Moore in a while and wondered if she had been drinking. He further stated that his observation of her in the parking lot convinced him that she had not. He testified that he had seen Mrs. Moore stagger while intoxicated in the past. When he saw her in the parking lot moments before her fall, she was walking "straight," albeit with her usual limp.
Later, Mr. Lucas became aware of a commotion in the store and learned that Mrs. Moore had fallen. He stated that when he knelt down to see if he could assist in her care, he did not smell any odor of alcohol. Like Jerry Moore, he observed blood and hair on the shelf where she struck her head.
Mrs. Moore's fall occurred at about 5:00 p.m. Her medical records from Morehouse General Hospital indicate that she arrived at its emergency room at 5:25 p.m. She was in a confused, semi-comatose state. Although she was able to speak, she was incoherent.
Her husband arrived at the hospital shortly after her admission, but he left soon thereafter. Mr. Moore testified that he left after being reassured of his wife's condition by her physician. In his notes, Dr. Joe B. Williams stated: "Attendant who reportedly was her husband was inebriated and seemed disinterested in her condition. He left the hospital soon after she was admitted."
After her arrival at Morehouse General Hospital, testing revealed that Mrs. Moore had a blood alcohol level of 0.09 percent. While the laboratory slip was stamped 7:48 p.m., it is unknown whether that time signifies when the blood sample was drawn from the patient, when the blood sample was received in the laboratory, or when the testing was completed.
During the evening hours following Mrs. Moore's admission, she became deeply comatose. The next morning, her physicians decided to move her to a facility where neurosurgical treatment would be available. She was promptly transferred to St. Francis Medical Center in Monroe, Louisiana.
By the time of Mrs. Moore's transfer to St. Francis Medical Center on April 19, 1985, she was already displaying signs of impending brain death. On April 20, 1985, Mrs. Moore was pronounced dead after all the criteria for brain death had been met.
Dr. James W. Geisler, a pathologist, performed an autopsy. The doctor reported his final pathological diagnosis as extensive intracerebral, intracerebellar, intrapontine, and intraventricular hemorrhage. He testified that the extensive hemorrhage was in excess of what might be expected from the trauma she sustained. However, he further testified that it would be impossible to tell whether the hemorrhage was due to trauma or if it was spontaneous. (Mrs. Moore's medical records reveal that she was also examined by Dr. D. Hammett at St. Francis Medical Center. Dr. Hammett's report states that it was his impression that the degree of intercerebral injury appeared to be in proportion to the degree of trauma found.)
Secondary findings of Dr. Geisler's autopsy revealed that Mrs. Moore had severe nutritional cirrhosis and acute and chronic pancreatitis. Dr. Geisler testified that the cirrhosis had been present for several years, but it was "quite likely" that Mrs. Moore was unaware of its presence when she obtained the instant policy in 1983. He testified that persons suffering from cirrhosis "might be under the influence of alcohol" at a lower blood level than persons not so afflicted. He further stated that the pancreatitis was secondary to either alcoholism or gall stones.
*776 Following Mrs. Moore's death, the plaintiff filed a claim with Central American Life Insurance Company as the beneficiary under her accident policy. Mr. Tex Kilpatrick, president of the defendant insurance company, declined to pay the claim because the company had information indicating: (1) that Mrs. Moore had died of a seizure or stroke, not of external, violent or accident means as covered by the accident policy; (2) that Mrs. Moore had falsely answered health questions on her application for insurance; and (3) that Mrs. Moore was under the influence of intoxicating beverages at the time of her injuries.
Mr. Moore filed suit against the insurance company on April 3, 1986. He sought the $5,000 death benefits, together with legal interest. He also requested penalties against the defendant, contending that it acted in bad faith when it denied his claim.
A trial on the merits was held on February 19, 1987. The plaintiff rested his case after introducing the insurance policy, Mrs. Moore's death certificate, and certain stipulations of undisputed facts. The stipulations related to the policy provisions, the payment of premiums, and the cause of Mrs. Moore's death being the injuries sustained in her fall. (By agreement, the plaintiff was also allowed to introduce into evidence the empty bottle of Paragoric Kaopectate which had been prescribed for Mrs. Moore about a week before her fall, as well as statements contained in medical reference books reflecting the content and use of this medicine.) The defendant then presented evidence relevant to its policy exclusions. At the conclusion of the trial, the court made several preliminary factual findings. The court found that Mrs. Moore's death was caused by external violence or trauma. It further found that there was insufficient evidence to prove that Mrs. Moore was aware that she was suffering from cirrhosis when she obtained the policy in 1983.
On August 6, 1987, the trial court filed its written reasons in which it denied recovery to the plaintiff. The court found that Mrs. Moore had been under the influence of intoxicating beverages at the time of her injury, and that her intoxication was a contributing cause of the accident. Consequently, recovery was precluded under the policy. A judgment denying the plaintiff's demands was signed on August 14, 1987.
The plaintiff filed this appeal. He argues that the trial court erred in its factual determination that Mrs. Moore was under the influence of intoxicating beverages at the time she was fatally injured. He also contends that the trial court erred in finding that the ingestion of alcoholic beverages caused the accident which resulted in Mrs. Moore's death.

EVIDENCE OF INTOXICATION
The plaintiff argues that the defendant failed to carry its burden of proving by a preponderance of the evidence that Mrs. Moore was under the influence of intoxicating beverages at the time of her injury and that intoxication caused her fall. We agree.
LSA-R.S. 22:213(B)(10) allows insurers to exclude from coverages "any loss sustained... in consequence of the insured's being intoxicated or under the influence of narcotics unless administered on the advice of a physician." While the statute does not define intoxication, the courts have applied the definition utilized in negligence cases that the person has had a sufficient quantity of intoxicants to make him lose control of his mental and physical faculties. Matthews v. All American Assurance Company, 226 So.2d 181 (La.App. 3rd Cir.1969), writ refused 254 La. 923, 228 So.2d 483 (1969). The policy issued to Mrs. Moore exercised the option under LSA-R.S. 22:213(B)(10) and specifically provided that it "does not cover death or injury to the insured caused ... (3) while the insured is under the influence of intoxicating beverages or under the influence of narcotics unless administered on the advice of a physician..."
The issue of intoxication frequently arises in the jurisprudence in the context of operation of motor vehicles. In criminal cases, LSA-R.S. 32:662 establishes a presumption that the operator of a motor vehicle was under the influence of alcoholic *777 beverages if, at the time in question, 0.10 percent or more by weight of alcohol was in his blood. While LSA-R.S. 32:662(C) specifically provides that this presumption is not applicable to a civil proceeding, the courts have consistently held that it does not prevent a civil litigant from introducing into evidence a person's blood alcohol content, along with expert testimony relating to the effects of such a level upon a person's ability to operate a motor vehicle. Parker v. Kroger's, Inc., 394 So.2d 1178, 1179 n. 3 (La.1981); Whittington v. American Oil Company (Amoco), 474 So.2d 41 (La.App. 4th Cir.1985), writ denied 477 So. 2d 693 (La.1985). In the present case, we deal not with the decedent's ability to drive a car, but her ability to walk without mishap. However, the general principles remain the same.
The trial court stated that it based its conclusion that the insurance policy's intoxication exclusion was applicable due to the following series of factors: (1) Mrs. Moore's history of alcohol abuse; (2) Mrs. Moore's elevated blood alcohol level; (3) the store manager's observation of Mrs. Moore shortly before her fall; (4) the absence of other causes of the fall; and (5) Mrs. Moore's physical condition.
The most substantial indication of Mrs. Moore's possible intoxication is a laboratory slip containing the finding of a blood alcohol level of 0.09 percent. However, we cannot satisfactorily determine, and the testimony does not establish, when the blood sample for this test was taken from Mrs. Moore. Dr. Geisler candidly admitted that he did not know whether the stamped time of 7:48 p.m. signified when the blood sample was collected or when the test results were reported. The record simply does not clearly reveal when the blood sample was collected. Dr. Geisler also conceded that he did not know what procedures the laboratory utilized in conducting such tests or even what type of alcohol would or would not be detected.
Dr. Geisler's testimony contained numerous generalizations. In response to questions about alcohol consumption by persons with cirrhosis, he stated:
[T]hey are not as able to metabolize alcohol and so to speak, get it out of their system as readily as a normal-an individual with a normal liver. And they might be under the influence of alcohol, very often are under the influence of alcohol, at a much lower blood level or less intake than a normal individual.
. . . .
This is not a hundred percent but very often they become under the influence of alcohol at a much lower level than a normal individual.
Dr. Geisler stated that generally a person weighing 150 pounds can metabolize about one and a half ounces of 90 proof alcohol in an hour. However, he added that metabolism and impaired liver functions would be variables to be considered.
Mrs. Moore's medical records were admitted into evidence under LSA-R.S. 13:3714. However, the weight given the records is determined by the presence of expert testimony to interpret those records. Brown v. Collins, 223 So.2d 453 (La.App. 3rd Cir.1969); Aites v. State, Through Department of Transportation and Development, 512 So.2d 865, 866 (La.App. 3rd Cir. 1987), writ denied on merits, 514 So.2d 133 (La.1987).
As no presumptions are available to the defendant to prove that Mrs. Moore was under the influence of intoxicating beverages, it was incumbent upon the defendant to present sufficient competent evidence of this fact. In this case, the defendant failed to establish that Mrs. Moore was under the influence of alcohol at the time of her injury. The laboratory slip demonstrates only that a blood sample taken from Mrs. Moore at an unspecified time resulted in a blood alcohol level of 0.09 percent.
Based upon Dr. Geisler's testimony, we can accord little or no weight to the finding of 0.09 percent blood alcohol level. By his own admission, the significance of the stamped time on the laboratory slip is questionable. Dr. Geisler gave no testimony as to Mrs. Moore's possible blood alcohol level at the time of her fall. Additionally, he never testified as to the effect of any level of alcohol in the blood on an individual's *778 ability to function. Specifically, he never testified as to the possible effects of alcohol on a person of Mrs. Moore's weight and metabolism.
While judicial notice may be taken of the fact that consumption of alcoholic beverages dulls the perception and reflexes, the percentage of alcohol in the blood stream necessary to produce intoxication is a matter of expert medical opinion and must be proved. Brown v. Collins, supra. In the absence of such proof, we find the medical evidence presented in this case to be insufficient to prove that Mrs. Moore was under the influence of intoxicating beverages. The laboratory slipwhich is itself ambiguousis not sufficient.
We also find that the testimony of the lay witnesses fails to establish intoxication. Two witnesses, Bobby Wayne Lucas and Jerry Moore, observed Mrs. Moore moments before her fall.[1] Mr. Lucas stated that he had known Mrs. Moore for thirty years. He testified that he had seen her when she was intoxicated and when she was sober. When he watched Mrs. Moore in the parking lot, he was examining her gait with an experienced eye to determine if she had been drinking. To the contrary, he observed her to be "walking good." He also made note of her usual limp.
Jerry Moore, the supermarket manager, answered affirmatively when questioned as to whether Mrs. Moore "walked peculiar almost all the time." However, the record is not entirely clear as to whether this was a reference to Mrs. Moore's usual limp. Additionally, when he testified that she was "staggering real bad" just prior to her fall, he admitted, "I didn't know [if] she was just real sick or what...." [emphasis added]
The evidence demonstrates that Mrs. Moore was a fifty-one-year-old emaciated woman weighing only 90 pounds. The testimony of her husband, which was corroborated by the prescription for Perogoric Kaopectate, established that Mrs. Moore had been suffering from a bout of diarrhea for at least several days before her injury.[2] Jerry Moore, who testified that he had seen Mrs. Moore intoxicated several times, had at least an initial impression that the decedent was displaying some indication of illness.
We conclude that the trial court erred in the determination that Mrs. Moore was under the influence of alcohol at the time she fell. However, assuming arguendo that the trial court was correct in finding Mrs. Moore was under the influence of alcoholic beverages, we address the issue of whether such intoxication caused her to fall. After examination of the record before us, we conclude that it is wholly lacking in evidence to substantiate such a finding.
Mrs. Moore was a frail woman who had been ill recently. None of the witnesses actually saw Mrs. Moore fall. The record is devoid of evidence as to the cause of her fall, and we are prohibited from speculating without factual support. It suffices to say that the defendant has failed to prove by a preponderance of the evidence that Mrs. Moore fell as a result of intoxication. As previously noted, Jerry Moore testified that it occurred to him that Mrs. Moore might be ill.
In light of the foregoing, we find that the trial court erred in concluding that Mrs. Moore was under the influence of intoxicating beverages at the time of her injury, and that intoxication was a contributing cause of her fall. Consequently, the judgment of the trial court must be reversed and set aside.

*779 PENALTIES
The plaintiff also seeks imposition of penalties against the defendant for nonpayment of his claim. The award of penalties for nonpayment of claims for accidental death under an accident insurance policy is governed by LSA-R.S. 22:657 which provides, in pertinent part:
(B) All claims for accidental death arising under the terms of health and accident contracts where such contracts insure against accidental death shall be settled by the insurer within sixty days of receipt of due proof of death and should the insurer fail to do so without just cause, then the amount due shall bear interest at the rate of six percent per annum from date of receipt of due proof of death by the insurer until paid.
The plaintiff asserted during oral argument that Mr. Kilpatrick, the president of the defendant company, denied the claim within days of Mrs. Moore's death and later conducted an investigation to justify his decision. We find no evidence to support such a contention. Mr. Kilpatrick declined to pay the claim with just cause after obtaining information which cast doubt upon the validity of the plaintiff's claim. Where an insurer has a reasonable ground to believe it has a valid defense, its refusal to pay a claim is not considered "without just cause" subjecting it to penalties, even though subsequently that defense is not upheld by the court. Furthermore, we are aware of no competent evidence in the record establishing the time frame in which this denial of the claim was made.
Inasmuch as the plaintiff has failed to prove his entitlement to penalties under LSA-R.S. 22:657(B), no penalties are awarded.

CONCLUSION
The judgment of the trial court is reversed. The plaintiff is hereby awarded death benefits of $5,000, plus legal interest thereon from date of judicial demand, until paid.
Accordingly:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, James M. Moore, and against the defendant, Central American Life Insurance Company, in the amount of $5,000, plus legal interest thereon from date of judicial demand, until paid. All costs are assessed against the defendant-appellee.
REVERSED AND RENDERED.
NOTES
[1] The trial court found both men to be credible witnesses. Mr. Lucas had, at most, tenuous and distant family ties to the plaintiff. However, Jerry Moore was previously involved in the lawsuit brought by the plaintiff against Big Star Supermarket over his wife's death. That suit was dismissed on a motion for summary judgment.
[2] The trial court specifically discounted Mr. Moore's testimony that his wife had not been drinking on the day of her injury. This was due to the discrepancies between Mr. Moore's testimony and his statements and actions as recorded in Mrs. Moore's medical records. However, independent evidence (the prescription) sufficiently corroborates his testimony about Mrs. Moore's illness.