561 So.2d 739 (1990)
Franz SOCORRO
v.
ORLEANS LEVEE BOARD and/or Board of Levee Commissioners of the Orleans Levee District; The City of New Orleans; The State of Louisiana; ABC Insurance Co.; DEF Insurance Co.; and XYZ Insurance Co.
No. 89-CA-0212.
Court of Appeal of Louisiana, Fourth Circuit.
March 29, 1990.
Rehearings Denied June 19, 1990.
*742 Phillip A. Wittmann, Stephen H. Kupperman, Charles L. Stern, Jr., Alex J. Peragine, Stone, Pigman, Walther, Wittmann & Hutchinson, and Raymon G. Jones, Jaime C. Waters, Deutsch, Kerrigan & Stiles, New Orleans, for the Board of Com'rs of the Orleans Levee Dist., defendant-appellant.
Robert A. Redwine, Alan D. Ezkovich, Sessions, Fishman, Boisfontaine, Nathan, Winn, Butler, & Barkley, New Orleans, for the City of New Orleans, defendant-appellee.
David W. Robertson, Austin, Tex., and Vincent J. Glorioso, Jr., Ronald A. Welcker, Dennis J. Phayer, Glorioso, Welcker & Phayer, New Orleans, and Edward A. Kaufman, Jeffrey Dickstein, Miami, Fla., for Franz Socorro, plaintiff-appellee.
Before BARRY, CIACCIO, LOBRANO, WARD and WILLIAMS, JJ.
PER CURIAM.
Plaintiff, Franz Socorro, sustained severe injuries when he dove from the bulkhead at Breakwater Point in New Orleans and struck a submerged object on the bottom of Lake Pontchartrain.[1] He sued the City of New Orleans, the Board of Commissioners for the Orleans Levee District (the "Levee Board"), and the State of Louisiana for damages as a result of that accident. Also named as defendants were the "XYZ" insurance companies, the then unknown insurers of the various defendants. Each defendant third-partied the other for contribution and/or full indemnity asserting their freedom from fault and the fault of their co-defendant.
After a bench trial, the trial court found the City 60% at fault, the Levee Board 30% at fault, and the plaintiff 10% at fault. No liability was imposed on the State. The court awarded damages in the following amounts:

Future Medical Expenses $4,352,943.00
Loss of future earning
capacity 338,000.00
Past Medical Expenses 139,091.35
Pain and suffering 3,500,000.00

All parties except the State appealed.
FACTS
Socorro is a Venezuelan citizen who was enrolled as a student at Delgado Community College in New Orleans in the fall of 1983.[2] After class on the afternoon of October 19, 1983, Socorro and a friend, Ronald Clarke, bought a six-pack of beer and drove out to Lake Pontchartrain for a swim. As they proceeded down Lakeshore Drive looking for a suitable place to swim, they noted numerous "no swimming" and "no diving" signs at various points along the lakefront. They eventually reached the western end of Lakeshore Drive, where they finished their beer and watched a number of people boating and windsurfing.[3] Socorro wanted to swim but *743 refrained from doing so because of the prohibitory signs posted along the lakefront. It appeared to them, however, that a number of people were swimming and windsurfing near Breakwater Drive. Socorro and Clarke drove to the end of Breakwater Drive, hereinafter called "the Point," where they hoped to go swimming themselves.
While en route down Breakwater Drive, Socorro and Clarke noticed rocks and boulders ("riprap") extending from the water on both sides of the road. When they reached the Point, they observed a number of people swimming and windsurfing in the waters adjacent to it. They saw no signs prohibiting swimming or diving, and concluded that those activities were permitted. The Point itself was surrounded on three sides by a vertical concrete bulkhead. The top of the bulkhead was flat, about fifteen inches in width, and stood about one foot above ground level of the Point. There was no visible riprap in the waters adjacent to the bulkhead.
Socorro had never been to the Point before. Clarke had been there several times but had never attempted to swim in the surrounding waters. Upon reaching the bulkhead, they observed the water but failed to ascertain the water conditions, except to note that it appeared dark and deep. Clarke jumped feet first from the bulkhead into the water four to five feet below. He testified that he never touched the lake bottom or any objects on the bottom. Socorro, who had been a competitive swimmer and diver in Venezuela, noted that the water was very dark, but apparently made no attempt to ascertain its depth. He executed two flat racing dives in a southerly direction from the bulkhead. These dives were without incident. Like Clarke, Socorro did not touch bottom or any objects on the bottom.
The two friends then decided to stage a race. They climbed to the top of the bulkhead, planning to dive together from there. There was a false start, and Socorro dove in while Clarke remained on top of the bulkhead. As Socorro entered the water, he struck his head on a submerged object believed to be rip rap lying on the lake bottom about ten feet from the bulkhead.
Clarke realized that Socorro was in trouble and waded in to rescue him. The water was chest deep. Clarke felt the bottom of the lake, noting that it was comprised of "a lot of stones." Clarke noticed Socorro was bleeding from the head, that his body felt flat and heavy and that he could not move his arms and legs. Socorro told Clarke that he could not feel anything. With assistance from a bystander, Clarke pulled Socorro from the water.
Medical help was summoned. Socorro was transported to Ochsner Hospital. Physical examinations revealed a laceration to the forehead. Neurological examinations revealed a complete sensory loss below the T-12 level and motor examination revealed complete paralysis of Socorro's arms and legs. X-rays revealed a compression fracture at the C5-6 level with complete motor loss below C6.
On November 27, 1983, Socorro was transferred from Ochsner to Baptist Hospital in Miami, Florida, where he remained until January 24, 1984 for additional treatment (including several surgical procedures) and rehabilitation therapy. He was discharged from Baptist with a final diagnosis of permanent quadriplegia with an accompanying neurogenic bladder. Socorro returned to Venezuela, where he now resides with his family.
In their appeal, the Levee Board, the City and Socorro assert the following assignments of error:
I. Liability
A. The Levee Board asserts:
1) The trial court erred in determining that the Levee Board had custody and control of the area into which plaintiff dove.
2) Even if one assumes that the Levee Board did have custody and control of the area into which plaintiff dove, the trial court erred in determining that the condition of the area created an unreasonable risk of harm.

*744 3) The trial court erred in failing to hold the Levee Board immune from liability pursuant to LSA-R.S. 9:2791, 2795.
4) The trial court erred in failing to hold the Levee Board immune from liability pursuant to LSA-R.S. 9:2798.1, discretionary immunity.
5) The trial court erred in determining plaintiff to be only 10% at fault for the injuries he sustained.
6) The trial court erred in excluding and refusing to consider any evidence relating to plaintiff's blood alcohol level and the effects thereof.
B. The City asserts:
7) The trial court erred in determining that they had "garde" of the Point so as to give rise to a duty to warn or otherwise protect plaintiff from diving.
8) Even assuming arguendo that the City had custody, control and "garde" of the Point, the trial court erred in determining the City breached its duty to warn Socorro or otherwise protect him from the danger of diving from the Point.
9) Assuming arguendo that the City had custody and "garde" of the Point, the trial court erred in finding that the absence of warning signs or other protective measures was a proximate cause of Socorro's injuries.
10) The trial court erred in failing to hold the City immune pursuant to LSA-R.S. 9:2791, 2795.
11) The trial court erred in failing to hold the City immune from liability pursuant to LSA-R.S. 9:2798.1, discretionary immunity.
12) The trial court erred in giving any credence to the testimony of Socorro and his companion Ronald Clarke.
13) The trial court erred in determining Socorro to be only 10% at fault.
14) The trial court erred in excluding and refusing to consider evidence relating to Socorro's blood alcohol level and the effects thereof.
C. Socorro asserts:
15) The trial court erred in allocating any comparative negligence to him.
16) The trial court erred in failing to enter judgment against Angelina Casualty Company, as the record clearly reflects that Angelina made a general appearance, thus subjecting itself to the Court's jurisdiction.
17) Alternatively, if the Levee Board is found free of fault, then the trial court's judgment should be amended to name the State as judgment debtor in place of or concurrently with the Levee Board.
18) The trial court erred in failing to hold the Levee Board and the City solidarily liable to Socorro for the full amount of his damages less his 10% assigned percentage of fault.
II. Damages:
A. The Levee Board asserts:
19) The trial court erred in failing to award the Levee Board indemnity on its cross claims against the City.
B. The Levee Board and the City assert:
20) The trial court acted contrary to the law and abused its discretion in the award of damages.
The City also filed in this Court a Peremptory Exception of No Cause of Action, urging that the City owed no duty to Socorro to warn or otherwise protect him from the obvious dangers inherent in the activity of diving into unknown waters.[4] The duty owed by the City to Socorro is a legal issue properly addressed on the merits of this appeal as it relates to the issue of liability.
SITUS OF ACCIDENT
To better understand the locations involved in this litigation and their importance in addressing the issues, a description of the West End area of New Orleans is necessary.
The Point, from which Socorro dove when he was injured, forms the easterly tip *745 of Breakwater Drive, a street actually built atop the crown of a breakwater. Constructed by the City in 1939 as part of a Works Progress Administration (WPA) project, the breakwater begins at the northwest corner of West End Park, extends in a peninsular fashion north into Lake Pontchartrain, then turns east almost ninety degrees and ends where the New Basin Canal and the Municipal Yacht Harbor enter Lake Pontchartrain. The breakwater forms the westerly and northerly boundaries of the Municipal Yacht Harbor and protects the Harbor from inclement weather and the elements. It is constructed of pieces of asphalt and concrete paving of varying sizes called riprap. The width of the breakwater at its base (underwater) is approximately one hundred feet, with a narrowing slope as it rises out of the water. The photographs in evidence give a clear visual appreciation of the sloping riprap on both sides of the breakwater as it rises from the lake bottom.
Breakwater Drive extends the entire length of the breakwater and ends at the Point. Although the Point is part of the breakwater, its configuration and construction is different from the rest of the breakwater. It consists of a vertical concrete bulkhead that extends upward from the lake bottom to a height approximately one foot above the inside street level. The bulkhead forms a semi-circle around the Point, protecting the end of the breakwater where it meets the lake. The circumference of the Point is large enough to allow vehicular traffic to make a "U" turn at the end of Breakwater Drive, as well as allow for parking along its inner side. Standing on top of the bulkhead and looking straight down, one does not see sloping riprap, but only the surface waters of Lake Pontchartrain. It is from this bulkhead that plaintiff dove into Lake Pontchartrain.
OWNERSHIP, CUSTODY AND CONTROL (Assignments of Error Nos. 1 and 7)
A major portion of the trial was devoted to the issue of which defendant had the custody and control of the area where plaintiff was injured. The trial court concluded that Breakwater Drive and Breakwater Point were under the exclusive custody and jurisdiction of the City of New Orleans, and the area of the lake bottom where plaintiff struck the submerged object was in the custody of the Levee Board. That conclusion forms the factual basis for the trial court's imposition of liability on both the Levee Board and the City.
Although not specified by the trial court, the legal basis of the judgment against the Levee Board and the City was either strict liability under LSA-C.C. art. 2317,[5] or negligence under LSA-C.C. art. 2316.[6] Liability under either theory necessarily depends on the relationship each defendant bears to the various areas involved.
The liability imposed by Civil Code Article 2317 is grounded in the custody or control of a defective thing. For purposes of that article custody means "supervision and control." Colleps v. State Farm General Insurance Co., 446 So.2d 988 (La.App. 3d Cir.1984). The term "custody" has its origin in the French term "garde." Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987). "According to the French understanding, garde is the obligation imposed by law on the proprietor of a thing or on the one who avails himself of it to prevent the thing from causing damages to others." Id. at 1030. Although ownership may indeed evidence the "garde" required for Article 2317, this guardianship may also rest with one who is not the owner. In Loescher v. Parr, 324 So.2d 441, 449 n. 7 (La.1975), the Supreme Court defined Article 2317 "custody:"
The things in one's care are those things to which one bears such a relationship as *746 to have the right of direction and control over them and to draw some kind of benefit from them. This relationship would ordinarily be associated with ownership but the guardianship will also belong to the bailee, the lessee, the usufructuary, the borrower for use and the repairman, among others ... The owner may transfer the guardianship by transferring the thing to another who will bear such relationship to the thing as to himself have the care of it. [Emphasis added.]
As a general rule, however, it can be said that guardianship rests with the owner until it is transferred to another. Jacobs v. Spinnakers, 474 So.2d 1019 (La.App. 5th Cir.1985).
Further, a defendant's "garde" of a thing can form the basis for fault in negligence under a duty-risk analysis, the only difference being the burden of proof. Bush v. Lafayette Insurance Co., 477 So.2d 900 (La.App. 4th Cir.1985). (Liability under both theories as applied to each defendant in this case is discussed in more detail later in this opinion.)
With these principles in mind, we now review the correctness of the trial court's findings.
A. Custody and Control of the City:
Ownership of the lake bottom, originally vested in the State of Louisiana, remains with the State. See LSA-C.C. art. 450. However, by Acts 1906, No. 209, the State granted to the City exclusive jurisdiction, administration and control over a defined area which includes Breakwater Drive, in the general area known as West End. That "defined" area is described as:
[A]ll lands now lying under the waters of Lake Pontchartrain between the protection or revetment levee on the south, the west bank of the New Basin Canal on the east, the prolongation of the boundary line between the Parishes of Orleans and Jefferson on the west, and a line drawn parallel to and in front of said protection or revetment levee a distance of 1500 feet therefrom on the north.... [Emphasis added.]
The City readily admits that the breakwater, Breakwater Drive and Breakwater Point are within its exclusive control and jurisdiction.[7] Nevertheless, the City argues in its first assignment of error (Assignment No. 7) that "garde," or the obligation to prevent the thing from causing damage to another, remained with the State pursuant to LSA-R.S. 41:1701. We disagree.
LSA-R.S. 41:1701 provides:
The beds and bottoms of all navigable waters and the banks or shores of bays, arms of the sea, the Gulf of Mexico, and navigable lakes, belong to the state of Louisiana and the policy of this state is hereby declared to be that these lands and water bottoms, hereinafter referred to as "public lands", shall be protected, administered and conserved to best insure full public navigation, fishery, recreation, and other interests. Unregulated encroachments upon these properties may result in injury and interference with the public use and enjoyment and may create hazards to the health, safety, and welfare of the citizens of this state.

*747 To provide for the orderly protection and management of these state owned properties and serve the best interests of all citizens, the lands and waterbottoms, except those excluded and exempted herein below, or as otherwise provided by law shall be under the management of the Department of Natural Resources, hereinafter referred to as "the department" which shall be responsible for the control, permitting, and leasing of encroachments upon public lands, in accordance with this Chapter and the laws of Louisiana and the United States. [Emphasis added.]
La.R.S. 41:1704(1) states:
As used in this Chapter:
(1) "Encroachment" means any construction, or improvement, obstacle, fill, or material which is placed upon or maintained upon state lands.
La.R.S. 41:1705(4) states:
This Chapter shall not apply to:
(4) Ordinary repairs and maintenance to existing encroachments; .... [Emphasis added.]
LSA-R.S. 41:1701 et seq. were enacted in 1978. Breakwater Drive and the Point were built in 1939. We need not address whether the legislature intended the statute to apply to encroachments existing forty years prior to its enactment. The statute does not impose upon the State the unqualified control and responsibility of all encroachments upon its water bottoms, but only provides that the State manage and regulate otherwise unregulated encroachments. Breakwater Drive and the Point are not unregulated encroachments. The City was given full authority and control over that portion of Lake Pontchartrain known as West End. In 1939, after reclaiming the area known as West End Park, the City developed the Municipal Yacht Harbor and constructed the breakwater, Breakwater Drive and the Point. We conclude from these facts that this area is under the exclusive control of the City and can hardly be classified as unregulated. Thus, the City's contention that garde of the Point rests with the State under LSA-R.S. 41:1701 is without merit.
Whether the City had control or jurisdiction over the lake bottom in the area where plaintiff dove, however, depends upon the determination of the eastern boundary as defined in Act 209. Although the Act does state a specific line, i.e., the western bank of the New Basin Canal, the present day location of that line is not readily ascertainable, as it undoubtedly was in 1906.[8] Confronted with that problem, the trial court weighed the conflicting testimony of the surveyors, various documentary evidence and photographs and determined that the eastern boundary of the legislative grant to the City actually bisected Breakwater Drive west of the Point, thus concluding that the actual location where plaintiff struck the submerged object was outside of the City's custody and control. We quote his reasoning:
(T)he easternmost line is not described as being a prolongation, but refers to following something that was known and natural at that time, namely, the west bank of the New Basin Canal. The only maps that the Court has seen indicate that there is a slight bend to the northeast at the northern end of a line that would extend out from the west bank of the New Basin Canal. By projection of that line, and not the jetty because there was a jetty that was built at the northeast end of that, but by projection of the west bank of the New Basin Canal without the jetty, the Court finds that the line would bisect what is now breakwater drive at a point west of the point of Breakwater Point so that the area into which Mr. Socorro dove was [not under the custody and control of the City].
We conclude that the finding of the trial court as to the easterly boundary of Act 209, at least for purposes of this litigation, is not clearly erroneous. James Courterie, a civil engineer and registered land surveyor, testified that it would be reasonable to *748 conclude that the eastern boundary is a prolongation of the west bank of the New Basin Canal even though the Act itself does not mention any "prolongation" on the eastern side. His reasoning is based on the fact that the Act defines the western boundary as a prolongation of the Orleans-Jefferson Parish line, and the northern boundary as parallel to and 1500 feet to the north of a protection revetment or levee. This determination is in accord with the affidavit of Coleman Kuhn, also a registered land surveyor and civil engineer. Contrary to this testimony was that of the Levee Board's expert, John Marshall.[9] After reviewing various earlier maps, he placed the eastern boundary of Act 209 right off the eastern tip of the point. This conclusion was predicated on a slight curve of the New Basin Canal to the northeast as it entered the lake. It is apparent the trial court found Courterie's resolution of the issue more credible, and thus we cannot say there is clear error in its determination of the eastern boundary of Act 209.
B. Custody and Control of the Levee Board:
After finding that the eastern boundary of the legislative grant to the City fell west of the Point and that the area into which Socorro dove was outside of this area, the trial court further concluded that the area into which Socorro dove was under the control of the Levee Board. The court based this finding upon the legislative history granting control of certain waterbottoms to the Levee Board. In its first assignment of error (Assignment No. 1), the Levee Board contends that this conclusion was erroneous. Particularly, they assert that the Court misinterpreted the grant of authority to the Levee Board in LSA-R.S. 38:307 and thus misapplied LSA-C.C. art. 2317. We agree.
State ex rel. Guste v. Board of Commissioners of the Orleans Levee District, 456 So.2d 605 (La.1984), provides the legislative history of the authority granted to the Levee Board, and we use it as the source of much of the following information. The legislative grant of authority from the State to the Levee Board began with an amendment to our Constitution of 1913 and was subsequently carried forward in the 1921 Constitution as Article 16, Sec. 7. That constitutional provision gave the Levee Board the authority to construct levees along the shore and in the bed of Lake Pontchartrain in an area not to exceed 2500 feet from the existing shoreline. In 1922 the article was amended to provide the additional authority to construct seawalls, jetties and "other works" within the 2500 foot area. It also granted to the Board title to all of the lands within any of its construction works. A further amendment in 1928 gave the Board additional authority to locate and relocate improvements, construct breakwaters and water basins, and conduct dredging operations within an expanded territorial limit of three miles from the shoreline. This amendment also gave the Board title to all public property necessary for the Board's purposes, to all lands reclaimed or filled in, and to all lands "within the territorial limits of said project."
When the 1974 Constitution was adopted, those provisions were carried forward in statutory form. See Acts 1975, No. 729. Those statutory provisions were again amended and reenacted by Acts 1985, No. 785, and now comprise LSA-R.S. 38:307. The pertinent provisions of that statute provide:
A. (1) The board ... shall have and exercise all and singular the powers now conferred ... by law, as well as such powers as are herein granted. The board shall have full and exclusive right, jurisdiction, power, and authority to locate, relocate, construct, maintain, extend, and improve levees, embankments, seawalls, jetties, breakwaters, water-basins, and other works in relation to such projects and to conduct all dredging operations necessary in connection therewith or incidental thereto along, over, and on *749 the shores, bottom, and bed of Lake Pontchartrain in the parish of Orleans from its western boundary to the boundary line separating township 11 south, range 12 east, from township 11 south, range 13 east, at a distance not to exceed three miles from the present shoreline, as the board may determine, and along and on the shores adjacent to the lake and along the canals connected therewith.

* * * * * *
B. (1) The board shall have the right, jurisdiction, power and authority to plan, execute, and maintain all the works and all the phases of the projects and improvements undertaken hereunder.

* * * * * *
F. All property owned by the state or the title to which is in the name of the state and all property which by its nature, situation, and location is not susceptible of private ownership under the present laws and constitution of this state, and within the area of works of reclamation and improvement is specifically vested in the levee board.
As stated by the Louisiana Supreme Court, the intent of these provisions was to give the Board "administrative authority over an area large enough to carry out its ambitious development plans without the need for periodic constitutional amendments," and to give title to those areas reclaimed so as to facilitate financing of the project. State ex rel Guste v. Board of Commissioners of the Orleans Levee District, 456 So.2d at 610. However, we do not view this grant of authority to the Levee Board as equivalent to garde over the entire area within the Board's jurisdiction.
Moreover, the record does not show that the Board ever obtained by virtue of this grant of authority the ownership, custody or control over the lake bed in the area where Socorro dove. The New Basin Canal, maintained and controlled by the Levee Board, is within the territorial area of the jurisdictional grant by the State. In February, 1987 the Levee Board obtained a permit from the U.S. Army Corps of Engineers to dredge its entrance. At the request of the City, the permit also included the entrance of the Municipal Yacht Harbor. The dredging operation was conducted with the Levee Board paying its share and the City its proportionate amount. The record indicates that the Board's dredging project came no closer than 100-125 feet of the area of plaintiff's dive, south of the Point.
We conclude, therefore, that the trial court was clearly wrong in finding that the area into which Socorro dove was under the custody and control of the Levee Board, and find that the lake bottom in that area remained in the custody and control of the State. Accordingly, we reverse the judgment of the trial court insofar as it held the Levee Board liable. The remaining assignments of error asserted by the Levee Board (Assignments Nos. 2-6) are pretermitted.
STRICT LIABILITY, ARTICLE 2317
As noted above, the trial court did not specify whether fault was predicated on strict liability under LSA-C.C. art. 2317 or negligence under LSA-C.C. art. 2316. For the following reasons, we determine that the evidence supports a finding under both theories.
An injured party seeking damages under Article 2317 need not prove that any particular act or omission on the part of the defendant caused his injuries. He must only prove that the thing which caused the damage was in the care or custody of the defendant, that it occasioned an unreasonable risk of injury to another and that his injury was caused by the defect. Shipp v. City of Alexandria, 395 So.2d 727 (La. 1981).
A. Liability of the City (Assignments Nos. 8 and 9):
(a) Custody
As detailed above, we have determined that the City had the custody of the breakwater, Breakwater Drive and the Point, and the State had "garde" or custody of *750 the lake bottom in the area into which plaintiff dove.
(b) Unreasonable Risk of Harm
Plaintiff has the burden of proving that the injury-causing things in defendants' custody posed an unreasonable risk of harm, i.e., were defective. In determining whether a given risk is unreasonable in a strict liability (or negligence) context, this court in Maltzahn v. City of New Orleans, 433 So.2d 417 (La.App. 4th Cir.1983) stated:
... the court must balance the probability of the harm posed plus the gravity of the harm which may ensue versus the utility of the thing in its condition on the date of the accident. The rights and duties of the parties must also be considered. This will necessarily involve examination of the conduct of both parties, i.e., was plaintiff's conduct, as it relates to the thing, reasonable; were defendant's actions or lack therefore unreasonable under the circumstances.
Id. at 419.
The difficult problem of determining what constitutes an unreasonable risk of harm was succinctly stated in Entrevia v. Hood, 427 So.2d 1146 (La.1983):
The unreasonable risk of harm criterion, however, is not a simple rule of law which may be applied mechanically to the facts of a case. It is a concept employed by this court to symbolize the judicial process required by the civil code. Since Articles 2317 and 2322 state general precepts and not detailed rules for all concrete cases, it becomes the interpreter's duty to decide which risks are encompassed by the codal obligations from the standpoint of justice and social utility.
Id. at 1149.
In Landry v. State, 495 So.2d 1284 (La. 1986), our Supreme Court applied the Entrevia reasoning in its determination of what constitutes an unreasonable risk of harm. In distinguishing the facts in Landry from those in Entrevia,[10] the court stated:
The facts and circumstances of the case before us pose an interesting contrast to Entrevia. The defect was a hole partially obscured by grass and located immediately beside the seawall in a spot where anyone stepping off the seawall would place their foot. The hole was located along lakefront property in the state's largest urban center. The lakefront has, since its opening, served as a recreation area which invites use by residents and tourists. A residential section is located across from Lakeshore Drive from the area of plaintiff's fall. The plaintiff was a recreational fisherman engaged in the conduct which he had every legal right to pursue. He was engaged in recreation which thousands of persons pursue along the same lakefront. The owner is a public body with taxing authority. The cost of any burden imposed by strict liability can be spread widely among the persons who enjoy the recreational pleasures of the lakefront. The potential for harm is great because the area is heavily used at all hours by adults and children. This particular defect is located in a spot where foot traffic would probably be frequent. The cost of prevention will not be substantial; a barricade will suffice to warn of the danger until the hole can be filled. [Emphasis added.]
Id. at 1288.
Thus, our duty is to examine the risks involved and determine their reasonableness in light of the social utility of the area and the burden which may be imposed on the responsible party.
*751 John Price and Brian Amond, two divers who inspected the lake in the area where Socorro was injured, testified that the water was approximately three to three and one-half feet deep. They testified that the lake bottom had a gradual but definite slope moving away from the seawall. Price testified the bottom consisted of oyster shells, gravel and a large amount of broken paving material for erosion control (rip rap). These chunks of asphalt debris were found in an area six to twelve feet from the bulkhead. The pieces ranged in size from six inches to six feet in diameter and were approximately six inches thick. The chunks were scattered about unevenly. Some were lying flat on the bottom. Others were partially buried in the bottom and protruding upwards on an angle. The largest pieces stood fourteen to fifteen inches above the bottom and approximately two to two and one-half feet from the surface.
Amond testified that he found chunks of paving material from one to five feet in length, some lying on the flat lake bottom and some partially buried. In the general area he saw at least fifty to seventy pieces of debris lying approximately fifteen feet from the bulkhead in three to five feet of water. Amond also testified that based on his knowledge and experience with the powerful movement of water, he would expect currents to move chunks of the rip rap away from the underwater portion of the breakwater and into the lake bottom.
This testimony clearly demonstrates the presence of the breakwater in the water adjacent to the Point and shows that rip rap of various sizes was scattered about the lake bottom. For divers, this area posed a danger which was exacerbated by the Point's deceptive and alluring features.
Dr. M. Alexander Gabrielsen, an expert in aquatic recreational areas, testified that he carried out an exhaustive on-site inspection of the Point and the adjacent waters and concluded that it was a dangerous area. Gabrielsen stated that he looked over the edge of the bulkhead into the water and could not see the bottom. He walked into the water around the Point. The deepest part was only one and one-half to two feet deep. He noted that even though the overall water level was very lowseven feet down from the top of the bulkhead to the surface of the waterhe still could not see the bottom, which consisted of shells, gravel and rocks (apparently rip rap).
Gabrielsen stated that the height and configuration of the bulkhead served as an invitation to use it for a platform and dive off. Because there were no rails, barriers or prohibitory signs to deter such activity, he opined that the bulkhead created an "illusion of safety". He further testified that the hazards of such an illusion are specifically recognized in the field of aquatic safety and in the recreation industry, as evidenced by the applicable guidelines calling either for the elimination or prevention of such alluring situations. This "illusion of safety" was further emphasized by the fact that there were numerous signs posted along other sections of the lakefront prohibiting swimming and diving with a complete absence of such signs at the Point. Under the circumstances, one could reasonably conclude that these activities were not only permitted at the Point, but were safe. Gabrielsen concluded that under these facts, this type of accident[11] could have been prevented through the use of very simple and inexpensive measures such as warning or prohibitory signs on the bulkhead or in the water close to the bulkhead[12] or a rope railing or other type barrier to prevent diving from atop the bulkhead. He estimated the expense for minimal *752 prevention (signs or a rope railing) to be approximately ten dollars.
The reasonableness of the above described dangerous areas, i.e., the breakwater and the Point, is determined by balancing the intended and actual use of the areas with whatever harm they pose and the burden of correcting or minimizing that harm.
The social utility of the breakwater, the Point and the adjacent waters needs little discussion. Similar to the location in Landry, supra, this area is frequently used for recreational activity. If the risks could be prevented only by closing the area to the public, then arguably, the utility of the area would outweigh the risks, and the risks would be considered reasonable. However, the evidence suggests that minimal, inexpensive preventive measures such as posting signs along the bulkhead, placing a barrier along the top of the bulkhead or simply painting "warning" signs on the bulkhead would be sufficient to warn of the danger posed by the breakwater and the Point. There is no evidence to suggest any protective measures were taken by the City.
Therefore, we conclude that the evidence supports the finding that the breakwater and the Point posed an unreasonable risk of harm.
(c) Cause of the accident
We have determined that the breakwater and the Point posed an unreasonable risk of harm and were under the custody and control of the City. We are satisfied the evidence supports the conclusion that plaintiff's accident was caused, at least in part, by the unreasonable risk (i.e. defect) that these areas posed. The City, as custodian, must bear a portion of the responsibility for plaintiff's injuries.[13]
B. Liability of the State (Assignment No. 17)
Plaintiff contends that, if this Court reverses the judgment against the Levee Board and holds that the area into which he dove was under the custody and control of the State, then the State is strictly liable under Article 2317. This assignment is without merit. The lake bottom of the area into which plaintiff dove was under the control of the State. However, plaintiff was injured when he struck a submerged object which was part of the breakwater in the custody and control of the City. Under the particular facts of this case, we cannot hold the State strictly liable for plaintiff's injuries.
NEGLIGENCE, ARTICLE 2316
As indicated earlier in this opinion, a defendant's relationship with the situs of the accident can form the basis of fault under LSA-C.C. art. 2316. In cases of this type, the only difference between a negligence theory and Article 2317 is the burden of proof. Bush v. Lafayette Insurance Co., supra.
To recover under Article 2316, the plaintiff must prove that the thing created an unreasonable risk of injury that resulted in damage, that the owner knew or should have known of the risk and that the owner/possessor failed to either remedy the situation, render the thing safe or take steps to prevent injury. Chatelain v. Project Square 221, 505 So.2d 177 (La.App. 4th Cir.1987), writ den., 508 So.2d 74 (1987). He must discover any unreasonably dangerous condition on his premises and either correct it or warn potential victims of its existence. Bush v. Lafayette Insurance Co., supra, citing Farr v. Montgomery Ward & Company, Inc., 430 So.2d 1141 (La.App. 1st Cir.1983), writ den., 435 So.2d 429 (La.1983). He does not have to insure against the possibility of injury but must act as a reasonable man in view of the probability of injury. Cates v. Beauregard, 328 So.2d 367 (La.1976), cert. den., 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976); Barcia v. Estate of Keil, 413 So.2d 241 (La.App. 4th Cir.1982).
A causal relationship must also exist between the harm and the negligent conduct or risk. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); *753 Lear v. U.S. Fire Insurance Co., 392 So.2d 786 (La.App. 3d Cir.1980). It must be proved by either direct or circumstantial evidence and must exclude other reasonable hypotheses with a fair amount of certainty. Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963). The conduct or risk must be the cause-in-fact of the injury, a factual determination to be made by the trier of fact which is entitled to great weight and which will not be disturbed on appeal unless manifestly erroneous. See Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La. 1988); McDermott v. New Orleans Public Service, Inc., 420 So.2d 993 (La.App. 4th Cir.1982). One must conclude that the victim would not have encountered the harm but for negligence or the creation of the risk. Armand v. Louisiana Power & Light Co., 482 So.2d 802 (La.App. 4th Cir. 1986), writ den., 484 So.2d 669 (La.1986).
This duty is owed by municipalities, political subdivisions and public entities, as well as private individuals. See Contranchis v. Parish of Jefferson, 299 So.2d 513 (La.App. 4th Cir.1974), writ den., 302 So.2d 35 (La.1974). In the instant case, the duty which the City owed to Socorro to protect him from injury and the breach of that duty are fully supported by the record.
We have already determined that the breakwater and the Point created a dangerous condition. After review of the evidence, we are satisfied that the City knew or should have known of the danger.
The Point and Breakwater Drive constitute a public recreation area.[14] The public has engaged in swimming and other water sports in the waters off the Point for years. Douglas Kennedy, maitre'd at the Southern Yacht Club for twenty-three years, testified that over the years has seen numerous swimmers in the water off the Point,[15] particularly on weekdays when boat traffic is light.
Thus, the facts and circumstances surrounding Socorro's injury, i.e., the shallow murky waters off the Point, the presence of large chunks of rip rap lying on the lake bottom, the inviting and alluring nature of the bulkhead which created an "illusion of safety", the regular use of the water off the Point (a dedicated recreation area) by the public for swimming and other water sports, and the clear absence of any warning or prohibitory signs or barriers as were present along other areas of the lakefront, all served to create an unreasonably dangerous risk of which the City knew or should have known. The record amply supports the trial court's conclusion that this risk, which the City knew or should have known about, was a cause-in-fact of Socorro's injuries.
The City strenuously argues that the holding of Hall v. Lemieux, 378 So.2d 130 (La.App. 4th Cir.1979), supports the conclusion that they had no duty to warn the plaintiff, and thus they are free from any fault. Under the circumstances of this case, we believe principles enunciated in Hall are more applicable to plaintiff's own fault and hence is discussed in connection with the apportionment of fault.
IMMUNITY (Assignments of Error 10 and 11)
A. Recreational Immunity: LSA-R.S. 9:2791, 2795
The City asserts that even if otherwise liable, it is immune from liability under LSA-R.S. 9:2791 and 2795 because 1) the Point and adjacent waters are in an "undeveloped" and "non-residential" area, and 2) the purpose of the statutes is to encourage property owners to make their land and water areas available for recreational purposes by limiting their liability. This assignment is without merit.
*754 LSA-R.S. 9:2791(A) reads in pertinent part:
A. An owner, lessee, or occupant of premises owes no duty of care to keep such premises safe for entry or use by others for hunting, fishing, camping, hiking, sightseeing or boating or to give warning of any hazardous conditions, use of, structure or activities on such premises to persons entering for such purposes. If such an owner, lessee or occupant give permission to another to enter the premises for such recreational purposes he does not thereby extend any assurance that the premises are safe for such purposes or constitute the person to whom permission is granted one to whom a duty of care is owed, or assume responsibility for or incur liability for any injury to persons or property caused by any act of person to whom permission is granted.[16]
LSA-R.S. 9:2795(B) provides in pertinent part:
B. (1) Except for willful or malicious failure to warn against a dangerous condition, use, structure, or activity, an owner of land, except an owner of commercial recreational developments or facilities, who permits with or without charge any person to use his land for recreational purposes as herein defined does not thereby:
(a) Extend any assurance that the premises are safe for any purposes.
(b) Constitute such person the legal status of an invitee or licensee to whom a duty of care is owed.
(c) Incur liability for any injury to person or property incurred by such person.
(2) The provisions of this Subsection shall apply to owners of commercial recreational developments or facilities for injury to person or property arising out of the commercial recreational activity permitted at the recreational development or facility that occurs on land which does not comprise the commercial recreational development or facility and over which the owner has no control when the recreational activity commences, occurs, or terminates on the commercial recreational development or facility.
LSA-R.S. 9:2791 and 2795 relate to the same subject matter and should be read in pari materia. Keelen v. State, Department of Culture, Recreation and Tourism, 463 So.2d 1287 (La.1985). LSA-R.S. 9:2791 limits the liability of an owner or occupant of property not used primarily for commercial recreational purposes while LSA-R.S. 9:2795 limits the liability of one owning property used primarily for recreational purposes. Nothing, however, in either statute suggests that the legislature intended to extend immunity to owners of all property without limit. Keelen, supra. Addressing the applicability of the immunity statutes to recreational areas found within a populated city near residential areas the Louisiana Supreme Court in Keelen, supra, stated:
The statement of purpose of La.R.S. 9:2795 is contained in 1975 La. Acts, No. 615, Section 1 and provides:
The purpose of the act is to encourage owners of land to make land and water area available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes.
The use of the language `land and water areas' is suggestive of open and undeveloped expanses of property. Furthermore, the type of recreational activities enumerated in both statuteshunting, fishing, trapping, camping, nature study, etc.can normally be accommodated only on large tracts or areas of natural and undeveloped lands located in thinly-populated rural or semi-rural locales. Specification of these types of activities suggests a policy that would encourage landowners to keep their property in a natural, open and environmentally wholesome state. We would stray from this goal were we to construe the statutes to *755 grant a blanket immunity to landowners without regard to the characteristics of their property. Thus, we conclude that the legislature intended to confer immunity upon owners of undeveloped, nonresidential rural or semi-rural land areas. The size, naturalness and remoteness or insulation from populated areas all attribute to the categorization of property as rural or semi-rural. [Emphasis added.]
Id. at 1290.
In Landry v. Board of Levee Commissioners of Orleans Levee District, 477 So.2d 672 (La.1986), rendered seven months after Keelen, the court again addressed the applicability of the immunity statutes to an injury occurring in an area along the New Orleans lakefront under the control of the Levee Board:
In Keelen, with respect to premises we determined that the Legislature by these statutes intended to confer immunity only upon owners of undeveloped, non-residential, rural or semi-rural land areas.

The Legislature surely did not intend to cloak with immunity the owner of such property as is involved here, a recreational area within a populated city, adjacent to a much travelled Lakeshore Drive, and within a stone's throw of an exclusive residential area developed in the City of New Orleans many years ago. Surely the legislature did not contemplate such property when passing statutes in 1964 and 1975 designed "to encourage owners of land to make land and water areas available to the public for recreational purposes." [Emphasis in original.]
Id. at 675. See also Ratcliff v. Town of Mandeville, 502 So.2d 566 (La.1987).
Thus, the instant case is directly on point with Landry. The Point and the immediately adjacent waters are located within a populated city, at the end of a much travelled road (Breakwater Drive) and within walking distance of a highly developed residential area and Municipal Yacht Harbor. Clearly this is not an area the legislature intended to cloak with immunity pursuant to La.R.S. 9:2791 and 2795. There is no error in the trial court's finding that the recreational immunity statutes are inapplicable.
B. Discretionary Immunity
Next, the City argues that it is immune from liability under LSA-R.S. 9:2798.1, the "discretionary function exception to governmental tort liability" statute.[17] The City argues that its failure to warn or otherwise protect plaintiff from diving into the waters off the Point was a discretionary policy making decision protected by LSA-R.S. 9:2798.1. We disagree.
LSA-R.S. 9:2798.1 was not enacted to protect against legal fault. To adopt such an interpretation would, in effect, reinstate the doctrine of sovereign immunity by rendering every act or omission by a governmental body "discretionary"a result clearly not intended by the legislature.
LSA-R.S. 9:2798.1 reads as follows:
A. As used in this Section, `public entity' means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards commissions, instrumentalities, officers, officials and employees of such political subdivisions.
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

C. The provisions of Subsection B of this Section are not applicable:

*756 (1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
D. The legislature finds and states that the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana. [Emphasis added.]
In enacting this statute the legislature makes reference to Article II of the Louisiana Constitution which provides:
Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others.
The limitation found in Article II of the Constitution only applies to conduct which is political, governmental, policy related and hence, purely discretionary in nature.[18] Examples of purely discretionary decisions would be the delegation of authority, the exercise of business regulation and police power or the implementation of administrative rules, policies and regulations. For instance, a decision by the City to close off Breakwater Drive and the Point to pedestrian and/or vehicular traffic during certain times of the day would be discretionary.
In the instant case, no decisions of a discretionary nature are involved. We find particularly enlightening the explanation in Denham v. United States, 834 F.2d 518 (5th Cir.1987), of what constitutes a discretionary function. The facts in Denham are very similar to those of the instant case.[19] Like defendants in the instant case, the United States in Denham asserted that its failure to safely maintain the area where plaintiff was injured was discretionary and could not serve as a basis for liability under the Federal Tort Claims Act. In affirming the district court's finding of liability, the Fifth Circuit stated:
This court has on many occasions considered the scope of the discretionary function exception. In Wysinger v. United States, 784 F.2d 1252 (5th Cir. 1986), we stated that discretionary function is to be broadly interpreted. At the same time, we held there that `once the government has made a decision to act the government is responsible for acts negligently carried out even though discretionary decisions are constantly made as to how those acts are carried out.' Id. at 1253. We elaborated upon this distinction in Wiggins v. United States, 799 F.2d 962 (5th Cir.1986):
"Once the government does undertake to supply a service, then it must be held responsible for negligent acts in supplying the service. This means that the discretionary exception only reaches the discretionary decision as to whether to supply the service or not. But once the discretionary decision has been made to supply the service, then the very purpose of the Tort Claims Act was to waive sovereign immunity and allow recovery for negligent actions of the government beyond the discretionary decision."

* * * * * * *757 Wysinger relied upon our decision in Butler v. United States, 726 F.2d 1057 (5th Cir.1984), where we held that once the critical discretionary decision is made, the government is `required to perform the related operational functions with reasonable care.' Id. at 1063. In Butler, several people had drowned when swimming at a state park after they stepped into an underwater depression. The depression had been created by dredging operations the Army Corps of Engineers undertook while repairing a hurricane-damaged seawall. We held that while the decision to dredge for sand needed to repair the seawall was a discretionary function, the failure either to fill in the depression or adequately to warn swimmers of the danger was an operational function for which the United States could be held liable under the FTCA. Id. at 1063-64.

* * * * * *
The United States complains that the district court erred by applying the discretionary function analysis in a rigidly chronological fashion. It contends that the decision not to check the swimming area for underwater hazards was itself discretionary and hence could not be the basis for imposing liability under the FTCA. We do not agree. The government's approach would subsume practically any decision within the discretionary function exception and thereby vitiate the FTCA. Denham was injured because the Corps chose to ring the swimming site with concrete blocks and then failed to ensure that they did not drift into an area where they would endanger swimmers. The Corps here was performing an operational function, and it did not have the discretion to do so negligently. See, Seaboard Coast Line Railroad Co. v. United States, 473 F.2d 714 (5th Cir.1973). [Emphasis added.]
Id. at 520-521.
The facts of Denham and the instant case are parallel. Once the City opened the area in question to the public as a recreation area, it had an affirmative duty to warn of the hidden dangers associated with diving and swimming. The evidence amply demonstrates that the City knew or should have known of the unreasonable risk of harm. Its failure to warn against or lessen the danger was not a policy making or discretionary decision. The trial court's finding that LSA-R.S. 9:2798.1 does not apply is eminently correct.
EVIDENCE OF BLOOD ALCOHOL LEVEL (Assignment No. 14)
The City asserts that the trial court erred in refusing to consider evidence of Socorro's blood alcohol level. Defendants attempted to prove that Socorro was intoxicated at the time of the accident and that this contributed to his injuries. Defendants offered into evidence the Ochsner Hospital record, which contained the results of plaintiff's blood alcohol test, and a report prepared by Dr. John R. Cook. In refusing to give any weight to this evidence, the trial court referred to the recent Supreme Court decision of State v. Rowell, 517 So.2d 799 (La.1988).
Rowell requires that, before evidence of a given blood alcohol level will be admitted into evidence, the proper foundation and predicate must be laid to insure the integrity and reliability of the blood alcohol tests. This foundation must show that proper procedures were used for repair, maintenance, inspection, cleaning, calibration, certification and chemical accuracy. In the instant case, the trial court found that defendants failed to meet this requirement and disregarded the evidence.
We agree that the proof offered as to the accuracy of the tests was inadequate. The only witness called by defendants to testify as to the procedures used in taking the blood sample was Gloria Prunty, medical technician at Ochsner. Her testimony was vague, insubstantial and based on hearsay. Prunty was unable to confirm Ochsner's standard calibration procedure on the instrument used to analyze Socorro's blood sample, whether the manufacturer's standard calibration procedure was followed when the instrument was last calibrated or whether the results obtained at the last calibration matched the manufacturer's standards. Prunty telephoned Ochsner *758 during a recess and apparently received the necessary information from another technician. Only then was she prepared to testify to calibration procedures used. The trial court refused to allow Prunty to testify further. Given her vague, insubstantial and attempted hearsay testimony, we find no error in the trial court's decision to exclude her testimony regarding Socorro's blood alcohol test results.
Even assuming arguendo that the proper predicate had been laid, the determination of the degree of weight[20] to be given to medical records is ultimately made by the trier of fact based on expert testimony interpreting the records. See Parker v. Kroger's Inc., 394 So.2d 1178 (La.1981); Moore v. Central American Life Insurance Co., 535 So.2d 773 (La.App. 2d Cir. 1988); Brown v. Collins, 223 So.2d 453 (La.App. 3d Cir.1969). No expert witness was called by defendants to testify as to the effects of Socorro's blood alcohol level on his judgment or physical coordination. Instead, a medical report in the form of a letter by Dr. John R. Cook was proffered into evidence. Besides the fact that this report constitutes inadmissible hearsay, Hookfin v. Bourne, 469 So.2d 24 (La.App. 1st Cir.1985); Matter of Fox, 504 So.2d 101 (La.App. 2d Cir.1987), writ den., 504 So.2d 556 (La.1987), it was of no value to the Court. Nowhere in the letter does Dr. Cook identify the individual whose medical records he examined or what documents he reviewed. He gave no specific findings regarding attendant conversion ratios, absorption rates or the type of blood sample testedwhole blood or plasma. Dr. Cook merely asserts that an unnamed individual was under the influence of alcohol to the extent that his judgment and motor coordination were significantly impaired. Thus, we cannot say that the evidence relied upon by defendants to prove Socorro was intoxicated at the time of the accident, is sufficiently probative to conclude that the trial court erred in disregarding it.
This assignment of error is without merit.
WEIGHT OF TESTIMONY (Assignment of Error 12)
The City asserts the trial court erred in giving any credence to the testimony of Socorro and his companion, Ronald Clarke. Defendant specifically points to the testimony of both witnesses that their feet never touched the bottom or any objects on the bottom. The city asserts that this testimony is incredible given the shallow depth of the water. We disagree.
The jurisprudence has long recognized that the factual conclusions of the trier of fact are entitled to great weight and should not be disturbed in the absence of manifest error, especially when these conclusions are based upon the trial court's superior and first hand opportunity to observe and evaluate the testimony of witnesses appearing before it. Thornton v. Ellington, 209 La. 613, 25 So.2d 282 (1946); Gravity Drainage District No. 1 of Rapides Parish v. Key, 234 La. 201, 99 So.2d 82 (1958); Kendrick v. Kendrick, 236 La. 34, 106 So.2d 707 (1959); Treitler v. American Druggists' Insurance Co., 474 So.2d 475 Bottling Company, Ltd., 454 So.2d 1193 (La.App. 4th Cir.1984), writ den., 459 So.2d 544 (La.1984). The trial court is always in a better position to observe the demeanor of witnesses appearing before it and to evaluate their credibility. Ageous v. Allstate Insurance Company, 442 So.2d 812 (La.App. 4th Cir.1983).
We find nothing in Socorro and Clarke's testimony that is so unreliable or improbable as to be totally unbelievable. The United States Department of Commerce Tidal Gauge readings which were introduced into evidence show that on October 19, 1983, at approximately the time of day during which the accident occurred, the tide level ranged from 5.06 to 5.09 feet. The variation in the water depth off the Point was also noted by Dr. Gabrielsen.
Clarke testified that when he jumped feet first into the water he made a concerted effort to keep his feet from touching the *759 bottom because he feared the presence of sea urchins and other unpleasant bottom dwellers. Socorro testified that his first two dives were flat dives or racing dives not calculated to result in deep penetration of the water. This testimony was corroborated by Clarke.
Thus, we find no error in the trial court's credibility call as it relates to Socorro and Clarke's testimony.
APPORTIONMENT OF FAULT (Assignments of Error 13 and 15)
The City asserts that the trial court erred in allocating only 10% comparative fault to Socorro. Socorro asserts that he was without fault or, at most, only minimally at fault.
The standard to be used in assigning percentages of fault was enunciated by our Supreme Court in Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967 (La.1985):
... the Uniform Comparative Fault Act, 2(b) and Comment ... incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) the extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Id. at 973-974. See also Gordon v. Commercial Union Insurance Co., 503 So.2d 190 (La.App. 4th Cir.1987), writ den., 506 So.2d 1227.
Specifically regarding appellate review of the allocation of comparative negligence this Court stated in Hammer v. Combre, 503 So.2d 624 (La.App. 4th Cir.1987) that:
It is well settled that the allocation of comparative negligence is a factual matter lying within the discretion of the trial court, and such determination will not be disturbed on appeal in the absence of manifest error. [Citation omitted.] When there is evidence before the trier of fact which upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. In other words, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even thought the appellate court may feel that its own evaluations and inferences are as reasonable. [Citation omitted.]
Id. at 625-626.
Mindful of our duty as a reviewing court as expressed in Hammer v. Combre, supra, after review of the record, we are satisfied that the trial court clearly erred in its allocation of only 10% fault to Socorro.
Earlier in this opinion, we noted the City and Levee Board's reliance on Hall v. Lemieux, supra, for the proposition that they had no duty to warn of the inherent dangers of swimming in unknown waters. In Hall the court held that plaintiff's petition failed to state a cause of action by alleging that decedent drowned because of the current in Bayou St. John. In support of its decision the court stated:
... there are inherent dangers of drowning in every body of water and the facility itself served as a warning of the dangers, especially to those who are of the age of discretion; in the absence of some *760 hidden or concealed danger there is no duty on the part of the drainage district to provide safeguards against persons falling into the canal, such as fences of warning signs.
The instant case is distinguishable from Hall in that the rip rap presented a concealed or hidden danger in the area where plaintiff dove. Therefore, we find no merit in the City's argument that it had no duty to warn. However, we believe the rationale of Hall (and the cases cited therein) is relevant to the issue of plaintiff's fault in cases of this type.
The jurisprudence has clearly recognized the primary duty of the swimmer or diver in ascertaining whether it is safe to conduct such activities in unknown waters. See Van Pelt v. Morgan City Power Boat Association, Inc., 489 So.2d 1346 (La.App. 1st Cir.1986), writ granted 493 So.2d 627 (La.1986); Haney v. General Host Corporation, 413 So.2d 624 (La.App. 1st Cir. 1982); Jolivette v. City of Lafayette, 408 So.2d 309 (La.App. 3d Cir.1981), writ den., 413 So.2d 495 (La.1982). Indeed, that reasoning is so strong that in factual situations such as alleged in Hall the courts have held that there is no duty on the landowner. However, in finding fault on Socorro's part, the trial court gave the following factual reasons which we feel justify rejecting a "no duty" argument.

* * * * * *
We come now to the duty of Mr. Franz Socorro himself. What Mr. Socorro observed when he came out to Lakeshore Drive that day were several areas where there was `no swimming''no diving' marked. When they reached the western end of Lakeshore Drive they saw across to Breakwater Point and saw swimmers in the water just offshore from Breakwater Point. Those swimmers apparently being windsurfers who had fallen off of their windsurfers and or other people just swimming. They then went around and saw no signs and came to the end of Breakwater Point and the seawall itself, which the Court finds was an invitation to dive. The water there looked deep and the water was dark, which from Mr. Socorro's experience down in Venezuela where he had dove off of rocks and rip rap areas before without consequence, appeared to be a safe area for swimming and driving, [sic] It was also a boating area where boats would be coming and going through the entrance to the harbor. It was different from the Breakwater Drive area with the rip rap because it had a seawall there instead of a sloping area, at least as far as visibility was concerned. What rocks there were visible in the water were back by the southwest end of the breakwater and there was no further indication that rocks were protruding from the water beyond an area maybe 10-feet east of the southwesterly point of the seawall.
He knew how to dive. He had been on the diving team and the swimming team. It was a warm day. There were no signs prohibiting diving or swimming in this area as there were on the fishing pier or along Lakeshore Drive. There was a flat top to the seawall itself approximately 15 inches in width. The top of that wall was only a foot or so above the land area on the land side of the seawall. And the water was inviting, so that Court finds Mr. Socorro did have an invitation to dive.
Although we reject a complete "no duty" argument, in light of the strong legal reasoning that a swimmer or diver has a primary duty to determine the safety of such inherently dangerous activities, we believe the trial court was clearly wrong in apportioning only 10% of the fault to plaintiff. Given the circumstances of this case, especially the "de facto" swimming and diving expertise of the plaintiff, we are of the opinion he is seventy-five percent (75%) at fault.
Accordingly, we apportion the fault of this case as follows:
Socorro at 75%
City of New Orleans at 25%
LIABILITY OF ANGELINA CASUALTY CO. (Assignment of Error 16)
Socorro asserts the trial court erred in failing to enter judgment against *761 Angelina Casualty Company (Angelina) in its capacity as the liability insurer of the City. Socorro sued the City and "DEF Insurance Company" as the City's unknown liability insurer.[21] Socorro admits that, following discovery, he learned that Angelina was the City's liability insurer. However, Angelina was never, by supplemental petition or otherwise, named or served as a party-defendant. Socorro asserts that notwithstanding this fact, Angelina submitted itself to the jurisdiction of the trial court (became a party-defendant) by virtue of having filed a motion for summary judgment on October 29, 1987 and having made a general appearance pursuant to that motion through its attorney, Robert A. Redwine. We disagree.
LSA-C.C.P. art. 7 provides, in pertinent part:
Except as otherwise provided in this Article, a party makes a general appearance which subjects him to the jurisdiction of the court and impliedly waives all objections thereto when, either personally or through counsel, he seeks therein any relief other than:
(1) Entry or removal of the name of an attorney as counsel of record;
(2) Extension of time within which to plead;
(3) Security for costs;
(4) Dissolution of an attachment issued on the ground of the nonresidence of the defendant; or
(5) Dismissal of the action on the ground that the court has no jurisdiction over the defendant. [Emphasis added.]
By the clear and unambiguous language of Article 7, it is self-evident that before one can submit to the jurisdiction of the court, one must first be a party to the suit. "A `party' to an action is a person whose name is designated on the record as plaintiff or defendant.... `Party' is a technical word having a precise meaning in legal parlance; it refers to those by or against whom a legal suit is brought, whether in law or in equity, the party plaintiff or the party defendant, whether composed of one or more individuals and whether natural or legal persons; all others who may be affected by the suit, indirectly or consequently are persons interested but not parties." Black's Law Dictionary (5th ed.1979).
Angelina was never made a party-defendant by Socorro. The mere filing of the original suit against "DEF Insurance", a legal fiction, does not serve to present a judicial demand against Angelina. See Cook v. Deshautreaux & Klein Pediatric Clinic, 315 So.2d 405 (La.App. 5th Cir. 1975). Thus, had Angelina been properly named and served as a party defendant in this suit their appearance in the motion for a summary judgment would have subjected them to the jurisdiction of the court as per C.C.P. Article 7. However, as a non-party, their appearance is of no consequence. We cannot enter a judgment against one who was not sued in the first instance.
This assignment of error is without merit.
SOLIDARY LIABILITY (Assignment of Error 18)
Socorro asserts the trial court erred in failing to hold the Levee Board and the City solidarily liable for the full amount of his damages, less his assigned percentage of fault. Because we have determined that the Levee Board is not liable for plaintiff's damages, we do not reach this issue.
QUANTUM (Assignment of Error 20)
The City asserts that the trial court acted contrary to the law and abused its discretion in its award of damages.
A. General Damages
The trial court awarded Socorro $3,500,000.00 in general damages for past and future pain and suffering, mental anguish and loss of enjoyment of life. Defendants assert that La.R.S. 13:5106(B)(1) limits a general damage award against the state, or any of its agencies or political *762 subdivisions, to $500,000.00. This contention has merit.
In Mullet v. Department of Transportation, 539 So.2d 897 (La.App. 4th Cir.1989), writ den., 541 So.2d 1390 (La.1989), this court held the provisions of LSA-R.S. 13:5106(B)(1) were remedial and thus the statute should be applied retroactively. The City falls within the provisions of the statute.[22] Thus the general damage award owed by the City is limited to $500,000.00.
Socorro is a quadriplegic confined to a wheel chair the rest of his life. We have reviewed the medical evidence and conclude that the trial judge did not abuse his great discretion in awarding $3,500,000.00 for pain, suffering and emotional distress. (See trial court's review of medicals, infra.) Subject to the limitations of La.R.S. 13:5106(B)(1), we find no compelling reason to alter this award.
B. Future Medical Expenses:
The trial court awarded Socorro damages for future medical expenses in the amount of $4,352,943.00. Defendants assert that this amount is excessive and based on inadmissible and irrelevant evidence. Specifically, they attack Dr. Lawrence Forman's testimony regarding cost itemizations for Socorro's "life continuum plan" as inadmissible hearsay, and his testimony regarding medical rehabilitation and treatment in the United States as irrelevant since Socorro resides in Venezuela.
We have reviewed the evidence, and rather than merely repeat what the records shows, we quote the trial court's reasons which adequately and correctly summarize Socorro's injuries and need for future care.

* * * * * *
The Court was duly impressed with Dr. Barth Green ... a board certified orthopedic surgeon and ... one of the leading specialists in serious spinal cord injuries such as those sustained by Mr. Socorro.... he indicated quite clearly ... there is no indication at present that any medical breakthroughs will be available to re-attach the severed spinal cord of Mr. Socorro, ... he does have slight function at the C-5 level, he has no function below the C-6 level, which includes a significant part of his arms, his hands and everything below there including his legs and bowel function, which is one of the major problems. As a consequence,... Mr. Socorro's disability is 100-percent as far as his previous capabilities were concerned.
However, this does not preclude retraining, education and his being able to obtain some type of employment since in fact the Court does know that other people have overcome this with the proper motivation.... And the Court also notes that some of the problems that face Franz Socorro in the future are that there is no probability for improvement.... He can not live independently. He can not transfer from his bed to a wheelchair. He could drive a van if he was properly transported into that van with the proper special controls for the van. This would permit him some mobility, although it would still not be able to permit him to get in and out of his wheelchair. It's necessary for him to take muscle relaxants and exercises with ice and stretching on a daily basis. One of the problems is the possibility of ulcers developing on the bottom of his thighs and buttocks from him having to sit a substantial amount of the time, which comes from the pressure of sitting. He's required to have special pads and chairs and also to be lifted occasionally to relieve pressure, which he cannot do on his own.
The Court would note that the "Day in the Life" film that was produced on behalf of the plaintiff was most revealing and is a great help to the Court to observe the kinds of daily activities that the plaintiff must go through and also to show the help he needs from other people that he cannot provide himself, either trained specialists or family and friends, *763 which would permit him to merely just live. The film was most enlightening in that regard. Other things that Franz Socorro is facing is the possibility of disuse osteoporosis in his bones which produces a loss of calcium when they're not used. This in turn increases the chances for fractures.... He also needs therapy treatments four times a week. He needs intensive rehabilitation at the present time and basically 24-hour-a-day care either with trained specialists or housekeeping specialists or non-specialists in taking care of him, ....
The Court also observed the videotape deposition of Dr. William Cohen, an expert board certified in the field of urology, concerning the lack of control of the bladder which was due to this spinal injury, and as a result of which Mr. Socorro has no voluntary control over the bladder... As a consequence of this it's necessary that Franz Socorro needs to have a catheter in place at all times and that has to be changed and cleaned daily by someone who's trained for it.... further indication of the necessity for 24-hour care. This condition further indicates the possibility of urinary tract infections in the future and the need for antibiotics....
Dr. Cohen further indicated that ... [t]his type of injury and the problems associated with it in and of themselves do not reduce a person's life expectancy. The key there, however, is to avoid infections resulting from the bladder problems which result from the spinal cord problems so that with proper care he should be able to lead a life to his full life expectancy.
Coming then to what has been referred to as the life-care plan for Franz Socorro which was prepared by and explained by Mr. Lawrence Stuart Forman ... who was tendered and accepted by the Court as a rehabilitation/habilitation counselor.... His occupation and profession has to do with preparing and supervising care programs for quadriplegics, which plan he described as being a `continuum care plan' rather than a life-care plan and includes the interrelationship and reaction of doctors, therapist, the injured party and his family and friends. He prepared very detailed reports concerning his evaluations and his interviews with Franz Socorro. His conclusions included the fact that Franz Socorro should return to college, but he feels that he observed that Mr. Socorro feels that he is imposing on his family....
The reports he prepared are numbered P-38, P-39, P-40 and P-41. The first three 38, 39 and 40 have to do with the evaluations, the maintenance and the vocational options respectfully. And the fourth one, P-41, covers the cost of providing the type of care that he felt was necessary for the continuum care plan devised for Mr. Socorro. Significant to note at this point is that there was only cross-examination of Mr. Forman. There were no opposing medical witnesses called by any of the defendants. Mr. Forman explained his care plan on direct examination and went through a rather lengthy cross-examination by all counsel for the other parties which basically explained in further detail the reasons and the needs for this type of a plan for the future. It should be noted that he further indicated that he is familiar with the cost of such facilities and personnel in Venezuela and other Latin American countries, and that as far as the expert care that Franz Socorro would need, that if that type of care were available in those countries it would be more expensive, at least as expensive or more expensive than the United States, which lends credence to the Court's acceptance of his figures for the care that he has indicated with a minor adjustment or two. While he recognized that food cost in Venezuela would be less than the United States and that live-in attendants of the custodial type would be less expensive than in the United States, all of the other skilled personnel and testing would either have to be done in the United States or would be more expensive or as expensive in Venezuela as it would be in the United States. There would also be the necessity where certain testing and evaluation studies are needed to be done for plane fare and transportation expenses for Mr.
*764 Socorro to come back to the United States for that care.
It should also be noted at this point that the City of New Orleans offered in evidence the ironically timely exhibit City 3, the Times-Picayune article of February 4th, 1988 concerning Scott Welch who was also a quadriplegic from a boat house incident diving or pushing and shoving incident and is now a tax attorney with the Internal Revenue Service here. But the Court notes that while it doesn't give any indication in the article of wages or wage losses, what it does indicate is all of the care and treatment is in the United States and all of the opportunities that he had for getting such a job are in the United States. As Mr. Homer Socorro indicated in his testimony and also Susana Socorro and Franz Socorro himself, Caracas, Venezuela is not geared for handicapped persons as the United States is with curb cuts, wide doors, elevators, support bars, low facilities, telephones, urinals, things like that, and especially in a university atmosphere, which is what is recommended for Franz Socorro in this particular case. So the Court does accept the report of Mr. Forman concerning the continuum care plan that he prepared in this particular case since it does appear to take into consideration future events and reasonably anticipated needs of Franz Socorro in the future. The prices contained in Exhibit P-41 appear to be reasonable figures which held up under cross-examination with no contrary evidence. As the court ruled when admitting P-41 into evidence, these appeared to be the kinds of data that are relied upon by persons in Mr. Foreman's [sic] profession in order to perform the type of work that he does. So for those two reasons, one, that they appear to be reasonable, and, two, they are the type of data that is normally used by a person in that profession, the Court accepts those figures as mentioned with a minor adjustment or two. The Court also notes that the reports prepared by Mr. Forman were reviewed by and approved by Dr. Green who is the main continuing treating physician taking care of Franz Socorro.
We next move to Doctor Irving J. Goffman... a consulting economist by profession. Dr. Goffman was accepted by the Court as an expert. Dr. Goffman was asked to determine first the cost of the life-care plan, secondly, loss of earning capacity, and thirdly, a reduction to current values of both the cost of the life-care plan and the loss of earning capacity for Franz Socorro. Dr. Goffman reviewed Mr. Forman's reports and then made his projections. The projections were contained in two computer printouts that were admitted into evidence as P-45 and P-46. The defendants called Dr. Kenneth Bourdreaux, an economist, to counter the inflation factor included by Dr. Goffman. Dr. Goffman basically indicated that an inflation factor of seven-and-a-half percent after taxes was one of the bases upon which he made his projections in the future. The Court finds that the seven-and-a-half projection for inflation is realistic, especially since Dr. Goffman used an interest figure for discounting of seven percent to seven-and-a-half percent which, in effect, made the inflation factor and the interest deduction discount factor a virtual washout. Dr. Boudreaux recognized that over the lifetime of his statistical analysis there is normally a difference between the inflation factors and the discount factors of roughly two to two-and-a-half percent. When considering that fact testified to by Dr. Boudreaux and comparing it to the factors enunciated by Dr. Goffman, Dr. Boudreaux's net figures would actually be probably more than Dr. Goffman's. This further supports the fact that Dr. Goffman's analysis is realistic and, if anything, on the conservative side. Dr. Goffman's discount factor would be approximately zero, compared to the two-and-a-half percent of Dr. Boudreaux on an historical basis. The figures then found by Dr. Goffman indicate that the total amount as shown on P-45 of the future medical care of Franz Socorro in gross amount would be $38,670,812.00. This is in United *765 States dollars. However, applying the discount factor that he did and discounting that to present value, the present value is found by Dr. Goffman to be $4,581,943.00 which the Court understands to be the present value of what it would cost in the future to provide the medical care in the continuum care plan that Mr. Forman had prepared for Franz Socorro. There was, however, an adjustment or two which came about on cross-examination so that subtracting the cost of an automobile rather than the full cost of a van being included with that deduction would bring the net present value of the future medical in this particular case to $4,352,943.00. So the Court would make that adjustment to the testimony and the computer printout of Dr. Goffman. [Emphasis added.]
The procedure to be followed by an appellate court in its review of damage awards has succinctly been enunciated by our Supreme Court in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), as follows:
Realistically, in quantum issues, as in other issues, there must necessarily be a degree of uncertainty in predicting the ultimate result in a given case. Results will differ principally because of the myriad differences in the cases presented for review. And, of course, there will continue to be honest disagreement among appellate judges when they attempt to determine whether the `much discretion' of Article 1934(3) has been abused in the trial court, and when they attempt to seek aid by looking to other possibly-comparable decided cases. Focusing an informed judgment tempered by a fair recognition of the discretion vested in the trial judge or jury (see the Chief Justice's comment in Miller v. Thomas, supra) [258 La. 285, 246 So.2d 16 (1971)] is no simple task resulting in uniform result among judges engaged in appellate review.
We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. [Citation omitted.] Only after making the finding that the record support that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court, (citation omitted). It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence.
Further we believe that, heretofore, courts of appeal have placed too must emphasis on their review of other reported decisions. Certainly no two cases are ever fully alike. And whether two cases are so similar as to produce like quantum judgments is hardly discernible by gleaning the facts of the comparable decision from simply a written opinion of an appellate tribunal. Of course, another factor bearing on this matter is that significant change has been, and is taking place in our society not the least of which are changes in economic conditions (particularly rampant inflation), fluctuating job categories, employment opportunities, and even lifestyles. Furthermore, it is impossible for an appellate court to judge what evidence in a particular case was given special weight by the finder of fact.
Id. at 335-336. See also, Reck v. Stephens, 373 So.2d 498 (La.1979).
The initial inquiry to be made by this Court is whether the trial court abused its "much discretion" in making this award to this particular plaintiff for his particular injuries. Jackson v. Evans Cooperage Co., 459 So.2d 699 (La.App. 4th Cir.1984); Brown, Tutrix of Dugas v. McDonald's Corp., 428 So.2d 560 (La.App. 4th Cir.1983); Sanders v. New Orleans Public Service, Inc., 422 So.2d 232 (La.App. 4th Cir.1982); Purcell v. State Farm Insurance Co., 417 So.2d 16 (La.App. 4th Cir.1982).
After a thorough and careful review of the evidence and testimony, we find no *766 abuse of discretion in the trial court's award.
Concerning future costs, defendants argue that much of the source information used by Dr. Forman constitutes inadmissible hearsay, and thus his testimony should have been excluded from consideration by the trial judge. We disagree.
Regarding his cost estimates, Dr. Forman testified as follows:
"Q. First off, the costs appearing on P-38 are in U.S. dollars we agree?
A. Yes, they are.
Q. And they were determined by you in connection withthey were either known or determined by you in this case and that is something you customarily do in your work when it's for court purposes?

* * * * * *
I do it for the state of Ohio. I do it in New York, Florida. I do it for major insurance company, Prudential, et cetera, Travelers, just to mention a few. My specific expertise in addition to the actual direct re-counseling is the long term case care management from a cost containment standpoint. So I use very recognized documents such as the national relative value scale. I use documents promulgated by the National Highway Auto Safety, by the National Spinal Cord Safety. And my own background and familiarity with the average cost and care of people in these conditions." [Emphasis added.]
Louisiana Code of Evidence Article 703[23] reads:
"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." [Emphasis added.]
LSA-C.E. Article 703 tracks verbatim corresponding Rule 703 of the Federal Rules of Evidence. In addressing this same issue of the use by an expert witness of information provided by another source in arriving at a cost estimate, this Court in Barley v. State, through the Department of Highways, 463 So.2d 689 (La.App. 4th Cir.1985) stated:
Although we can find no civil cases in Louisiana that deal with this issue, it is interesting to note that the Federal Rules of Evidence specifically allow the type of testimony involved in this case. Rule 703 states:
`The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.'
Thus, an examination of all the relevant law on this point convinces us that the portion of [contractor's] estimate taken from the leveling sub-contractor is allowable.
Id. at 693.
Clearly, the cost itemizations used by Dr. Forman were based upon sources customarily relied upon by experts in his particular field in forming opinions as to the estimated costs of future medical expenses. Thus, these sources and information do not constitute inadmissible hearsay, and were proper support for Forman's conclusion.
Defendants further assert that Dr. Forman's testimony on future medical expenses based upon costs and treatment in the United States is of no probative value *767 because Socorro is a Venezuelan citizen residing in Venezuela. We disagree.
There is no Louisiana jurisprudence which addresses the applicable standards to be used in determining future medical expenses due foreign nationals injured in the United States. Once again the federal jurisprudence is helpful and instructive.
In Hernandez v. M/V Rajaan, 841 F.2d 582 (5th Cir.1988), cert. den., ___ U.S.___, 109 S.Ct. 530, 102 L.Ed.2d 562 (1988), and Sosa v. M/V Lago Izabal, 736 F.2d 1028 (5th Cir.1984), the United States Fifth Circuit affirmed the district court's award of future medical expenses as to a Mexican national based on United States standards and costs. In Hernandez the court held that the decision of which rate to use is a finding of fact which varies from case to case. Both Hernandez and Sosa are parallel to the instant case. The evidence clearly shows that Socorro returned to Venezuela only after his discharge from Baptist Hospital in Miami because of financial inability to continue treatment there. In addition, the medical evidence shows that he was not receiving the care he needed to progress in Venezuela and, as a result, his condition deteriorated.
Thus, Dr. Forman's calculations of future medical and rehabilitation expenses based upon United States standards and prices are relevant and probative. We find no error in the trial court basing its award on these calculations.
C. Loss of Future Earning Capacity:
The trial court awarded $338,145.00 for loss of future earning capacity. Defendants assert the award is not supported by credible evidence because, first, it is purely speculative as Socorro was not employed at the time of the accident and had no training or experience in any particular field or profession and second, because it is based on United States work-life expectancy figures not applicable to a foreign national who, in all probability would not have been allowed to work in the United States. No evidence was available as to work-life expectancy standards for Venezuela.
In arriving at this award, the trial court used United States projections but rejected the formula used by Socorro's expert, Dr. Goffman and instead relied upon the formula of defendants' expert, Dr. Boudreaux. The Court stated:
Turning then to loss of future earning capacity, the testimony was basically that if Mr. Franz Socorro could and indications were that he would be able to go to college, earn a degree, and secure a job here in the United States compared to what his earning capacity was otherwise, he would have a wage earning capacity loss over his continuing life. And the Court finds that the Dr. Goffman projection of that work life to age 65 is not according to normally accepted standards since what we are attempting to do is to predict now what will happen in the future, and in that regard, statistics are what the courts generally rely upon rather than a statement that the person is going to work to age 65 because, in fact, for many reasons persons do not always live that long or work that long. And for one reason or the other, unrelated to any particular injury like this, a person would not work to age 65. Accordingly the Court would use the approach taken by Dr. Bourdreaux of Tulane University, recognized expert in the field of economics, and would apply instead the U.S. Department of Labor work life statistics table which would add 32 years of work life to Franz Socorro's present age. As Dr. Boudreaux explained, this doesn't necessarily mean that it's age 58. It means that it's 32 more years of work in addition to his present age. He explained that for one reason or the other, people might drop out of the work force for a period of time. In fact, it's their work life that they're looking at ... how many years to age 58, which would be 32 years beyond present age. The Court therefore finds that according to the Dr. Goffman projected tables of the future earning capacity loss, instead of using the bottom figure, the to be used in this particular case is $338,145.00.
*768 Much discretion is vested in the trier of fact for the reasonable assessment of damages which are insusceptible of precise measurement. LSA-C.C. art. 1999.[24]
Our jurisprudence has long recognized that damages for impairment of earning capacity cannot be calculated with mathematical certainty and therefore are speculative in nature and fall within the "much discretion rule." In Perkins v. Ricks, 514 So.2d 180 (La.App. 4th Cir.1987), this Court stated:
Loss of future income is not merely predicated upon the difference between a plaintiff's earnings before and after a disabling injury, but upon the difference between a plaintiff's earning capacity before and after an injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979); Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2nd Cir.1984). Loss of future income awards thus encompass the loss of reduction of a plaintiff's earnings potentiala person's capability to do that for which she is equipped by nature, training, and experience, and for which she may receive compensation. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). The Trial Judge's instruction to the jury properly assigned and communicated the relative importance of Perkins's work record prior to her injury-that is, the jury was to consider her earning potential before and after the injury. [Emphasis in original.]
Id. at 184. See also Garrett v. Celino, 489 So.2d 335 (La.App. 4th Cir.1985); Klein v. Himbert, 474 So.2d 513 (La.App. 4th Cir. 1985).
Thus, applying the "much discretion rule" and considering the fact that there are no comparable work-life expectancy tables for Venezuela, we find no error in the trial court's acceptance and use of the United States work-life expectancy tables, which Dr. Boudreaux testified were nothing more than averages, in determining the award for loss of future earning capacity.
DECREE:
IT IS ORDERED, ADJUDGED AND DECREED that fault in this matter is apportioned as follows:

 Franz Socorro 75%
 City of New Orleans 25%
 Orleans Levee Board 0%

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the total damages sustained by Franz Socorro are as follows:

 Past Medical Expenses $ 139,091.35
 Future Medical Expenses 4,352,943.00
 Loss of Future Earning
 Capacity 338,145.00
 Past and Future pain and
 suffering, mental anguish
 and loss of enjoyment
 of life 3,500,000.00

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the City is liable for its proportionate share of the above damage award, subject to a $500,000.00 limitation on the award for pain, suffering and mental anguish.
AMENDED, AND AS AMENDED, AFFIRMED.
LOBRANO, J., concurs in part and dissents in part.
WILLIAMS, J., dissenting with reasons.
LOBRANO, Judge, concurring in part and dissenting in part.
The only aspect of the majority opinion with which I agree is application of the $500,000.00 limitation. Mullet v. Department of Transportation, 539 So.2d 897 (La.App. 4th Cir.1989), writ denied, 541 So.2d 1390 (La.1989).
In all other respects I agree with the trial court judgment. Although the trial judge did not specify the basis of fault for *769 each defendant, I am satisfied the evidence supports either Article 2317 fault or negligence.
Both the City and the Levee Board had the required "garde" or custody of the area from which plaintiff dove and into which plaintiff dove. I believe the evidence substantiates that both areas pose an unreasonable risk of harm and thus are defective within the meaning of article 2317.
The evidence also convinces me that both the City and Levee Board knew or should have known of the dangers of the breakwater and the adjacent waters. The Point and Breakwater Drive are public recreation areas. The public has engaged in swimming and other water sports in that area for years. The Levee Board regularly patrols the New Basin Canal, particularly near the mouth where this accident occurred.
The facts and circumstances surrounding plaintiff's injury, i.e. the shallow, murky waters off the Point, the presence of large chunks of rip rap lying on the lake bottom, the inviting and alluring nature of the bulkhead which created an "illusion of safety", the regular use of the water off the Point by the public for water sports, and the clear absence of any warning or prohibitory signs or barriers as were present along other areas of the lakefront, all served to create an unreasonable risk which both defendants knew or should have known. The record supports the trial court's conclusion that this risk was a cause in fact of plaintiff's injuries.
WILLIAMS, Judge, dissenting.
I disagree with the majority's holding that the Point and the breakwater presented an unreasonable risk of harm which caused plaintiff's injury and rendered the City strictly liable for plaintiff's damages under LSA-C.C. art. 2317. I further disagree that the City owed plaintiff an affirmative duty to warn of the open and obvious danger of diving into untested, murky waters and was guilty of negligence under LSA-C.C. art. 2316.
First, in holding the City strictly liable, the majority found that the very presence of the breakwater (rip rap) in the murky waters off the Point created an unreasonable risk of harm for divers and that this risk was exacerbated by the Point's "illusion of safety." The majority reached this conclusion under the guise of a balancing test, but failed to fully consider several pertinent facts. At the time of this tragic accident, plaintiff was engaged in an activity which is inherently dangerous, namely, diving into untested waters in a lake where he could not see the bottom. Not only was plaintiff of sufficient age of discernment, but also he had been a competitive swimmer and diver in Venezuela. In light of this, plaintiff's action was not reasonable under any scenario. Further, while the Point and its surrounding waters is a recreational area, plaintiff failed to show that the area is frequently, if ever, used by the public for diving. Thus, this case is distinguishable from the case cited by the majority, Landry v. State, 495 So.2d 1284 (La. 1986), in which the plaintiff was engaged in an activity which thousands of persons pursue in the same area. Although the gravity of harm for one who dives into shallow, unfamiliar water is great, the potential for that harm is minimal where the attending risks are obvious to anyone of discerning age and the public apparently does not use the area for that activity. Balancing these facts against the enormous social utility of the breakwater, I cannot say that the Point and the breakwater posed an unreasonable risk of harm.
Next, in holding the City liable in negligence, the majority concluded that the City owed to a reasonable adult of plaintiff's age and experience a duty to warn of the danger involved in diving from the Point into the murky, shallow waters below. The majority's premise, that the Point and the breakwater presented an unreasonably dangerous condition, is without basis. The danger of diving into unfamiliar waters, especially where water conditions prevent the diver from seeing the bottom, is known *770 to persons of all ages and levels of experience. As detailed above, plaintiff was an experienced swimmer and diver of suitable age who dove into the murky waters of an unfamiliar lake without first ascertaining the water conditions. As courts of other states have recognized, the danger of executing a flat dive into muddy waters of uncertain depth in a natural lake is open and obvious to a reasonable adult and does not create a duty on the part of the defendant to warn of the attending risks. Dowen v. Hall, 191 Ill.App.3d 903, 138 Ill.Dec. 933, 548 N.E.2d 346 (1989). Cf. Casper v. Charles F. Smith & Son, Inc., 316 Md. 573, 560 A.2d 1130 (Md.1989) [In a suit for injuries sustained by two children who fell through a frozen stream, the Court concluded that water (including water containing a submerged hazardous condition) presents an obvious and patent danger reasonably appreciated by anyone of sufficient maturity and that the owner cannot reasonably be required to take affirmative steps to warn of the presence of the condition].
In holding the City liable, the majority emphasizes that the City is a public body which is in a good position to absorb the costs of plaintiff's tragic accident by redistributing them to the community. Although plaintiff's accident is tragic, the result reached by the majority is hardly socially sound in light of the fact that the risk which plaintiff encountered when he dove from the bulkhead was not unreasonable, but open and obvious to anyone of plaintiff's age and experience.
I respectfully dissent.
NOTES
[1] The areas named in this preface and factual presentation are more particularly described later in this opinion.
[2] Socorro was studying in the United States on a student visa. He had been in this country for only about five weeks.
[3] The record is not clear as to when they drank the beer or how much each drank. Socorro asserts that he had two.
[4] This same issue was raised by the City in a motion for summary judgment prior to trial, in a motion for involuntary dismissal at the close of Socorro's case, in a similar motion after submittal of all evidence and in a motion for a new trial. All were denied. On December 2, 1987, this Court denied writs, finding the City had adequate remedy on appeal. On January 22, 1988, the Louisiana Supreme Court also denied writs.
[5] Article 2317 provides, in part:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.
[6] Article 2316 provides:

Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.
[7] In response to Socorro's request for admissions of fact, the City admitted and acknowledged its ownership and control of Breakwater drive and the Point on October 13, 1983. At trial, the City formally stipulated to ownership and control of Breakwater Drive and the Point, to wit:

"Your Honor, the City has answered requests for admission listed by plaintiff's counsel in which the City admits that it owns, controls and everything else, the entire breakwater including the Point. This [testimony and evidence offered by Socorro] is allI don't know what the purpose of it is, but if it's to establish ownership and control, we've admitted that."
In its brief filed in this Court, the City admits that it "had custody of the Point and could dedicate it as a public park ... and could and did police the area and repair and maintain it..."
The admission and stipulations by the City constitute a judicial admission or confession which becomes the law of the case. R.J. D'Hemecourt Petroleum v. McNamara, 444 So.2d 600 (La.1983), cert. den., 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 39 (1984); Placid Oil Co. v. A.M. Dupont Corp., 244 La. 1075, 156 So.2d 444 (La. 1963).
[8] Compounding the problem is the fact that a major portion of the New Basin Canal has been filled in since passage of the act.
[9] Also in evidence is the survey by J.J. Krebs & Sons, Inc. prepared in connection with the dedication by the City of the entrance to the Municipal Yacht Harbor. The line on that survey clearly has no relation to Act 209.
[10] In Entrevia plaintiff was injured when she entered upon an isolated, unproductive rural property. The court stated: "The property had little worth or utility at the time of the accident and the owner was in a poor position to absorb the costs of premises' risk and redistribute the costs to the community. There was no social or economic good to be achieved in imposing a burden which would require total destruction or high level restoration of an obsolescent farm building. The vice in the property was the rear steps, but the building was remotely located behind a fence which plainly warned against trespassing. The magnitude of the risk posed and the gravity of the harm threatened were small when weighed against other risk presented by things in our society." Entrevia v. Hood, 427 So.2d at 1287-1288.
[11] Gabrielsen testified that Socorro fit the profile of 100 diving accidents occurring in natural waters88% of the injured divers were males, the average age was 22.5 years, most were strangers to the area, 80% were injured within the first three dives and more importantly, "in every instance they had not been warned in any manner that there was a danger there in that particular location."
[12] Gabrielsen did not suggest signs in the water further than a couple of feet from the bulkhead because of the hazard these could cause to boating. However, he did conclude that some warning in the water such as a buoy was also a viable option.
[13] The apportionment of fault will be discussed, infra.
[14] By Act of Dedication on November 26, 1968, the City formally recognized "Breakwater Recreation Area" by dedicating Breakwater Drive and the Point solely for public use and recreational purposes.

Dr. Gabrielsen testified that within his one and a half hour inspection of the Point he observed 31 vehicles come and go.
[15] The Southern Yacht Club is located directly across from the Point, separated only by the entrance to the Municipal Yacht Harbor.
[16] "Land" includes water and water courses. LSA-R.S. 9:2795(A)(1); "recreational purposes" includes "swimming", LSA-R.S. 9:2795(A)(3); and "owner" includes any person in control of the premises, La. R.S. 9:2795(A)(2).
[17] LSA-R.S. 9:2798.1 was enacted in 1985, two years after Socorro was injured. However, because we find that the City's failure to warn was not a discretionary policy decision as contemplated by the statute, we need not address the issue of whether or not § 2798.1 may be applied retroactively.
[18] See Saint v. Irion, 165 La. 1035, 116 So. 549 (1928); O'Meara v. Union Oil Company of California, 212 La. 745, 33 So.2d 506 (1948); Palfrey v. Carlisle, 29 So.2d 185 (La.App. 2d Cir.1947); Breard v. City of Alexandria, 69 F.Supp. 722 (W.D.1947).
[19] Plaintiff went swimming at a lake which was operated, maintained and controlled by the U.S. Army Corps of Engineers, an agency of the United States government. Plaintiff was injured when, while executing a dive, he struck his head upon a solid object resting on the lake bottom which could not be seen from the surface. It was determined that plaintiff struck an abandoned concrete anchor originally used by the corps to secure surface buoys used to mark the swimming area. Plaintiff suffered a compression fracture of his fifth cervical vertebra, resulting in quadriplegia. The Corps did not inspect the swimming area on a regular or periodic basis for either natural or artificial hazards and posted no signs warning of the unobservable underwater danger.
[20] Even if the blood alcohol test results had been admissible as part of the hospital records, its probative value under the circumstances of this case remains an issue.
[21] In his original petition, Socorro named as party defendants: the Orleans Levee Board and/or Board of Levee Commissioner of the Orleans Levee District; The City of New Orleans; the State of Louisiana; ABC Insurance Company; DEF Insurance Company; and XYZ Insurance Company.
[22] LSA-R.S. 13:5102 defines state agency and political subdivision. Clearly the City is a political subdivision.
[23] Comment (d) to Article 703 provides:

Under this Article the facts or data underlying the expert witness' opinion may properly be:
(1) matters within his firsthand knowledge;
(2) facts or data presented to him at trial, thus approving the use of hypothetical questions; and (3) under designated circumstances, facts or data not admissible in evidence (because, for example, their source is inadmissible hearsay), if they are of a kind reasonably relied upon by experts in the particular field in arriving at their opinions or inferences.
[24] LSA-C.C. art. 1999 is new. It is based upon the principle of law known as the "much discretion rule" contained in former C.C. Art. 1934(3). See also Edwards v. Sims, 294 So.2d 611 (La. App. 4th Cir.1974).